2019 IL App (1st) 181123

No. 1-18-1123

Opinion filed September 26, 2019

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| DEBRA ELAM and WILLIAM ELAM, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Cook County. |
| | ) | |
| v. | ) | No.16 L 5671 |
| | ) | |
| O'CONNOR & NAKOS, LTD., and DANIEL V. O'CONNOR, | ) | |
| | ) | Honorable |
| | ) | James N. O'Hara, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    In this legal malpractice action, plaintiffs Debra and William Elam have sued defendants, the law firm of O'Connor & Nakos, Ltd., and attorney Daniel V. O'Connor, who had represented plaintiffs in the underlying wrongful death action against several entities following the death of their daughter, Megan Elam, who suffered fatal injuries as a passenger in a car driven by an intoxicated friend after a concert. After the wrongful death litigation settled, plaintiffs sued defendants, alleging they failed to investigate the wrongful death claim, conduct discovery, and

plead particular theories of liability against the concert venue operator, Live Nation Worldwide, Inc. (Live Nation), and thereby forced plaintiffs to accept an inadequate settlement.

¶ 2    The trial court granted summary judgment in favor of defendants, ruling that plaintiffs could not have succeeded on their underlying wrongful death action against Live Nation because the independent acts of the intoxicated driver of the car in which Megan was a passenger broke the causal connection between any alleged negligence by Live Nation and Megan's fatal injuries.

¶ 3    On appeal, plaintiffs argue that defendants were not entitled to summary judgment in the legal malpractice action because plaintiffs could have recovered more money from Live Nation in the wrongful death action if defendants had pled that Live Nation (1)  breached its duty to concertgoers to prevent injuries that were a reasonably foreseeable consequence of the alcohol consumption and tailgating activity that occurred on Live Nation's premises, and (2) failed to exercise due care in its voluntary undertaking to provide security at its concerts and monitor concertgoers for signs of intoxication that would place them and their passengers at risk if they were allowed to drive off the premises while intoxicated.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court that granted summary judgment in favor of defendants.[1] We hold that plaintiffs could not establish that they would have recovered more money from Live Nation in the wrongful death action but for defendants' alleged negligent failure to plead business premises and voluntary undertaking theories of liability against Live Nation because plaintiffs cannot show a basis for Live Nation's liability under either theory.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 5                           I. BACKGROUND

¶ 6     According to the pleadings, depositions and affidavits filed in this matter, on August 13, 2011, Megan attended a concert in Tinley Park with her friends, including Sarah Lavko. Live Nation hosted and promoted the concert and owned, operated, managed and maintained the premises where the concert was held. Live Nation also employed certain individuals to provide security services for the concert.

¶ 7     Prior to the concert, Lavko purchased a bottle of rum at a store and then she, Megan and others went to the home of a friend and drank a large quantity of rum from that new bottle and a previously opened bottle. Lavko then drove to the concert and Megan was one of her passengers. Live Nation's security personnel were present in the parking lot and some concertgoers were drinking alcohol and smoking marijuana. Whereas some deposition testimony indicated that Lavko joined an ongoing party in the parking lot and drank from the bottle of rum she had brought, other testimony indicated that the group did not drink in the parking lot because they were running late. When Lavko and her passengers passed through the gates and entered the concert venue, Live Nation's gate security personnel did not confiscate a glass marijuana pipe in Lavko's purse or identify her as an already intoxicated guest.

¶ 8     Some deposition testimony indicated that, during the concert, Lavko drank beer and a mixture of codeine and clear soda and she appeared obviously intoxicated, swaying and stumbling woozily. However, other testimony from two of Lavko's passengers indicated that they did not recall observing her drink while at the concert. Nevertheless, there was no dispute that Live Nation's personnel did not notice Lavko during the concert. When another friend of Megan's offered her a ride home with his friends and their designated driver, Megan declined his

offer. After the concert, Live Nation's personnel did not prevent Lavko from getting behind the wheel of her car, and no evidence indicates that Live Nation's personnel noticed her or her condition as she walked to her car. Lavko drove away from the concert venue with Megan as one of her passengers. Tinley Park police officers controlled the traffic that left the venue.

¶ 9    According to a police accident reconstruction analysis, about one mile from the venue, Lavko was driving approximately 83 miles per hour in a posted 50-mile-per-hour zone while approaching a curve. She drove off the laned roadway and onto the gravel shoulder and then steered back onto the roadway. She then steered the vehicle to the right, causing it to sideslip in a clockwise direction. At that point, the speed of the vehicle exceeded 73 miles per hour. The vehicle went off the road, into a drainage ditch, and rolled over. Megan was not wearing a seatbelt and was ejected from the car. Police recovered at the scene Lavko's bottle of rum, which was more than three-quarters empty. Megan was transported to a hospital where she was pronounced dead at 12:29 a.m. on August 14, 2011. Lavko's blood alcohol concentration level (BAC) was taken approximately 1.25 hours after the crash and registered at .197, which exceeded the .08 legal limit set forth in the Illinois statute.

¶ 10    In August 2011, plaintiffs retained defendants to pursue money damages from various defendants in connection with the car accident. In July 2012, plaintiffs settled with Lavko and her insurance company for the $100,000 full policy limit.

¶ 11    On August 13, 2012, defendants filed plaintiffs' wrongful death action, which alleged a claim for breach of section 6-21 of the Liquor Control Act of 1934, commonly known as the Dramshop Act (235 ILCS 5/6-21 (West 2010)), against Live Nation; Aramark Sports & Entertainment Services, LLC (Aramark), a food, beverage and retail merchandise vendor at the

concert; and two residents of the home where Megan and Lavko had consumed alcohol before the concert. In 2013, plaintiffs settled with Aramark for $135,891.98.

¶ 12    Also in 2013, defendants filed a third amended complaint alleging that Live Nation was liable for the wrongful death of Megan because it negligently directed and required vehicles, including Lavko's vehicle, to exit the venue onto a road that led to a dark and dangerous street with unexpected turns. Although the third amended complaint still included the Dramshop Act claim against the two residents of the home, plaintiffs ultimately voluntarily dismissed that claim.

¶ 13    Live Nation denied the allegations of negligence. In its affirmative defenses, Live Nation alleged that (1) Megan was contributorily negligent for failing to fasten her seatbelt and riding in a vehicle operated by an impaired person; (2) Lavko, who consumed intoxicating liquors and operated her vehicle while impaired, was the sole proximate cause of Megan's injuries; and (3) Live Nation was entitled to set-off the money plaintiffs had received from other alleged joint tortfeasors.

¶ 14    Thereafter, Live Nation moved for summary judgment, arguing that plaintiffs did not present a factual basis that would arguably entitle them to a judgment because Live Nation did not owe Megan any duty to direct the traffic that left the concert onto public roadways, did not cause the auto accident, and was not a proximate cause of her injuries and death. Specifically, Live Nation cited the affidavit of its employee, Courtney Rouke, to establish that Live Nation employees did not dictate the direction of travel as vehicles exited the venue parking lot and entered onto public roadways. Rather, Tinley Park police exclusively directed the vehicles exiting the venue and dictated the direction the vehicles traveled upon entering those public

roadways. Live Nation also cited the undisputed facts that the crash occurred more than one mile away from the concert venue; Lavko was intoxicated and her BAC exceeded the limit set by Illinois law; and she was traveling approximately 83 miles per hour in a posted 50-mile-per-hour zone while approaching a curve in the road.

¶ 15    The court did not rule on Live Nation's motion for summary judgment because in July 2014 plaintiffs signed a settlement agreement accepting $10,000 from Live Nation.

¶ 16    In 2016, plaintiffs sued defendants for legal malpractice, alleging that they negligently evaluated, prepared and prosecuted plaintiffs' case against Live Nation, failed to timely plead recognized theories of liability against Live Nation, and thereby forced plaintiffs to accept an inadequate settlement of $10,000 from Live Nation. Specifically, plaintiffs alleged that Live Nation (1) knew concertgoers had "a propensity to drive drunk and *** had a policy in place prohibiting unauthorized liquor, drinking and tailgating in the parking lot"; (2) "voluntarily undertook to provide security measures *** and *** assumed the duty to provide security and protection to [concertgoers]"; (3) "had the obligation to perform this duty with due care and competence"; and (4) "was negligent by providing inadequate security, failing to enforce its own rules and policies, and facilitating Lavko driving off from the venue knowing of her impaired state." Plaintiffs argued that defendants "[f]ailed to timely plead viable theories of liability against Live Nation based on breach of duty to provide adequate security and an in-concert theory of liability.[2] According to plaintiffs, defendants instead negligently pled the futile theory

---

[2] A common-law negligence cause of action based on an in-concert theory of liability must show that the plaintiff was harmed by the tortious conduct of another and the defendant (1) did a tortious act in concert with the other or pursuant to a common design with him, or (2) knew that the other's conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct himself, or (3) gave substantial assistance to the other in accomplishing a tortious result and the

that Live Nation negligently directed Lavko to drive on an unsafe roadway even though the local police were solely responsible for directing traffic once vehicles left the venue's parking lot. Plaintiffs also alleged that defendants failed to timely reply to Live Nation's affirmative defenses, oppose its motion for summary judgment, and explain to plaintiffs that they were time barred from amending their complaint to plead viable claims based on Live Nation's negligent conduct inside the venue because those claims would not relate back to their original filing.

¶ 17    In their answer, defendants denied plaintiffs' allegations of negligence.

¶ 18    Thereafter, defendants moved for summary judgment, arguing that plaintiffs could not show that any alleged negligence by defendants proximately caused plaintiffs to lose any viable claim against Live Nation. Specifically, defendants argued that Live Nation, as a matter of law, could never have been liable in the wrongful death litigation because the auto collision that caused Megan's death occurred outside Live Nation's control and Live Nation did not proximately cause the accident. Furthermore, defendants argued that no evidence showed that Live Nation either failed to provide adequate security or observed Lavko enter her car while intoxicated and proceed to drive away. Defendants also argued that plaintiffs were estopped from bringing their malpractice action because they had accepted the $10,000 settlement from Live Nation to avoid the matter being dismissed on summary judgment.

¶ 19    In response, plaintiffs argued that proximate cause was a question of fact, and the trier of fact could find that Live Nation's negligence contributed to or acted in combination with Lavko's negligence to ultimately cause Megan's death.

---

defendant's own conduct, separately considered, constituted a breach of duty to the plaintiff. See Restatement (Second) of Torts § 876 (1965).

Here, plaintiff has forfeited on appeal the in-concert theory of liability.

¶ 20    After the trial court reviewed the parties' briefs and responses, the court granted summary judgment in favor of defendants on the legal malpractice claim, ruling that plaintiffs could not show that they could have succeeded in their underlying wrongful death action based on negligence claims against Live Nation because Lavko's independent negligent acts of driving while intoxicated at an excessive speed broke any causal connection between Megan's death and the alleged negligent acts of Live Nation.

¶ 21                                          II. ANALYSIS

¶ 22    Summary judgment is a drastic means of disposing of litigation and should be entered only when the right of the moving party is clear and free from doubt. *Gilbert v. Sycamore Municipal Hospital,* 156 Ill. 2d 511, 518 (1993). A defendant moving for summary judgment may meet the initial burden of production by either affirmatively showing that some element of the case must be resolved in defendant's favor, or by showing the absence of evidence supporting the plaintiff's position on one or more elements of the cause of action. *Hutchcraft v. Independent Mechanical Industries, Inc.*, 312 Ill App. 3d 351, 355 (2000). The plaintiff is not required to prove his case at the summary judgment stage; in order to survive a motion for summary judgment, he must present a factual basis that would arguably entitle him to a judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002).

¶ 23    Summary judgment is only appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The court must construe these documents and exhibits strictly against the moving party and liberally in favor of the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance*

*Co.*, 213 Ill. 2d 307, 315 (2004). The court may draw reasonable inferences from the undisputed facts, but where reasonable persons could draw divergent inferences from the undisputed facts, the issue should be decided by a trier of fact and the motion for summary judgment denied. *Siegel v. Village of Wilmette*, 324 Ill. App. 3d 903, 907 (2001); *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 271-272 (1992). We review a trial court's grant of summary judgment *de novo*. *Home Insurance Co.*, 213 Ill. 2d at 315. That is, we perform the same analysis as a trial court and may make our decision on any basis in the record, regardless of whether the trial court relied on that basis. *Guterman Partners Energy, LLC v. Bridgeview Bank Group*, 2018 IL App (1st) 172196, ¶¶ 48-49.

¶ 24    To succeed in a claim for legal malpractice, the plaintiff client must plead and prove that (1) the defendant attorney owed the client a duty of due care arising from the attorney-client relationship, (2) the defendant breached that duty, and (3) as a proximate result, the client suffered injury. *Tri–G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 225–26 (2006). "In malpractice cases based upon the attorney's conduct during litigation, *i.e.*, the prosecution or defense of a prior claim, a plaintiff must generally prove a case-within-a-case to establish proximate cause." *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 344 (2010) (citing *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 200 (2006) and *Tri-G, Inc.*, 222 Ill. 2d at 226).

> "The fact that the attorney may have breached his duty of care is not, in itself, sufficient to sustain the client's cause of action. Even if negligence on the part of the attorney is established, no action will lie against the attorney unless that negligence proximately caused damage to the client. The existence of actual damages is therefore essential to a viable cause of action for legal malpractice.

[Citation.]

*** If the underlying action never reached trial because of the attorney's negligence, the plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action." *Tri–G, Inc.*, 222 Ill. 2d at 226.

¶ 25    Here, the "case within a case" on which plaintiffs' legal malpractice claim is predicated was their negligence cause of action against Live Nation for the wrongful death of their daughter. In a negligence action, the plaintiff must set out sufficient facts establishing the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from that breach. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12.

¶ 26    Determining whether a duty exists turns in large part on public policy considerations. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 303 (2000). When deciding whether a duty exists in a particular case, courts consider the reasonable foreseeability of the plaintiff's injury; the likelihood of the occurrence; the magnitude of the burden of guarding against it; and the consequences of placing that burden on the defendant. *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 2018 IL 120951, ¶ 22. "In the absence of a showing from which the court could infer the existence of a duty, no recovery by the plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper. [Citation.] Whether under the facts of a case there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court." *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991).

¶ 27    "Although the issue of proximate cause is ordinarily a question of fact determined by the trier of fact, it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257–58 (2004). "[T]he term 'proximate cause' describes two distinct requirements: cause in fact and legal cause." *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257–58 (1999). A defendant's conduct is a "cause in fact" of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. *Id*. at 258. A defendant's conduct is a material element and substantial factor in bringing about the injury if, absent that conduct, the injury would not have occurred. *Id*. "Legal cause," by contrast, is largely a question of foreseeability. The relevant inquiry is whether "the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct." (Emphasis in original.) *Id*. at 260.

¶ 28    In their legal malpractice complaint, plaintiffs alleged that defendants failed to timely plead viable negligence theories against Live Nation based on its breach of duty to provide adequate security and tortious conduct in concert with Lavko. Before this court, plaintiffs argue that their viable claims against Live Nation are based on (1) its failure as the owner of business premises open to the public to prevent physical harm to concertgoers for injuries that were a reasonably foreseeable consequence of the prohibited tailgating and excessive alcohol consumption that took place on its premises; or (2) its failure to exercise due care in performing its voluntary undertaking to provide security at its concert, which included monitoring concertgoers for signs of intoxication that would place them or others at risk if they were permitted to drive off the concert premises while they were still intoxicated.

¶ 29 Plaintiffs argue that the trial court did not address these business premises and voluntary undertaking liability claims and instead erroneously ruled that defendants' alleged negligent pleading did not, as a matter of law, proximately cause plaintiffs' loss because plaintiffs had no viable claim against Live Nation based on the trial court's finding that Lavko's independent acts of driving while intoxicated at an excessive speed broke the chain of causation attributable to Live Nation's negligence. Plaintiffs challenge the trial court's finding, arguing that Lavko's conduct acted in combination with Live Nation's negligence, which was a contributing cause of Megan's death.

¶ 30 Defendants respond that they were entitled to summary judgment in this legal malpractice claim because (1) Lavko's intoxicated driving at an excessive speed broke any causal connection between Live Nation's alleged negligence and Megan's death; (2) plaintiffs could not, as a matter of law, establish any duty owed by Live Nation or demonstrate any breach of duty; or (3) the evidence demonstrates that Live Nation would have prevailed on its affirmative defenses in the wrongful death case.

¶ 31                           A.  Business Premises Open to the Public

¶ 32 To support their premises liability claim against Live Nation, plaintiffs refer to the principles set forth in section 344 of the Restatement (Second) of Torts § 344 (1965) concerning the duty of landowners to prevent injuries to their invitees by the acts of third persons when those injuries are a reasonably foreseeable consequence of activity that takes place while the invitee is on the premises. See *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006) (based on the restaurant's special relationship with its customers, the restaurant owed them a duty to protect them from an unreasonable risk of physical harm, and this duty encompassed the negligent act of a third person who drove her car and crashed through the restaurant's brick half-

wall). Plaintiffs argue that Live Nation had an affirmative duty to prevent the reasonably foreseeable car crash that occurred here based on the facts that Lavko came to the concert already intoxicated, drank more alcohol while tailgating in the parking lot despite a prohibition on that activity, drank more alcohol inside the concert, and then entered her car after the concert and drove off the premises.

¶ 33    Defendants respond that plaintiffs are proposing on appeal a new theory about Live Nation's duty in the underlying wrongful death case—*i.e.*, that Live Nation knew or should have known that Lavko was extremely intoxicated and Live Nation had both the opportunity and duty to prevent her from driving her car off its premises in that condition. Defendants argue that this theory was not pled in plaintiffs' complaint or raised before the trial court and thus is forfeited and cannot be raised for the first time on appeal. Defendants also argue that plaintiffs could not have prevailed against Live Nation on a theory of business premises liability because the undisputed facts establish that the collision did not occur on Live Nation's property.

¶ 34    Plaintiffs rely on the following section of the Restatement to support their premises liability claim:

> "§ 344 Business Premises Open to Public: Acts of Third Persons or Animals
>
> A possessor of land who holds it open to the public for entry for his business purposes *is subject to liability to members of the public while they are upon the land* for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it." (Emphasis added.) Restatement (Second) of Torts § 344 (1965).

¶ 35     It is undisputed that the collision that fatally injured Megan occurred about one mile away from Live Nation's premises. The "owner or operator of premises has a duty to provide a reasonably safe means of ingress and egress both on his premises and, within limitations dictated by the facts of the case, beyond the precise boundaries of such premises." *Haupt v. Sharkey*, 358 Ill. App. 3d 212, 218 (2005) (the patron departing the tavern remained the tavern's business invitee at the time the patron was attacked by a third party, even though the patron had at that point just stepped beyond the legal property line of the tavern).

¶ 36     Under the facts here, Live Nation had no duty based on premises liability to protect Megan from the alleged foreseeable collision caused by Lavko's dangerous driving because the collision occurred about one mile away from Live Nation's concert venue. Thus, forfeiture notwithstanding, plaintiffs could not have succeeded on a claim alleging that Live Nation violated a duty owed to Megan based on business premises open to the public under section 344 of the Restatement, which gives no basis to impose a duty on Live Nation as a landowner to ensure the safety of all concertgoers once they voluntarily exit the premises and drive home.

¶ 37     We find that, as a matter of law, plaintiffs could not have prevailed against Live Nation under a liability theory of business premises open to the public.

¶ 38                                    B. Voluntary Undertaking

¶ 39    In the alternative, plaintiffs argue that they had a viable voluntary undertaking claim against Live Nation because it voluntarily undertook the duty to provide security at its concerts and, as a distinct component of that duty, to monitor concertgoers for signs of intoxication that would put them and those accompanying them at risk if they were permitted to drive off the premises while still intoxicated. Plaintiffs argue the evidence shows that Live Nation failed to exercise due care in performing this voluntary undertaking and that failure proximately caused Megan's death.

¶ 40    Defendants respond that plaintiffs would not have prevailed against Live Nation on a voluntary undertaking theory because the undisputed facts establish that duty could not have been assessed against Live Nation since there was no evidence that Live Nation had any actual knowledge that Lavko was intoxicated and Live Nation did not force Lavko or Megan to leave the premises.

¶ 41    The duty of care imposed upon a defendant under a voluntary undertaking theory of liability is limited to the extent of the undertaking. *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992). This theory is narrowly construed (*id*. at 33), and the Illinois Supreme Court has looked to the Restatement (Second) of Torts (Restatement (Second) of Torts §§ 323 through 324A (1965)) in defining the parameters of this theory of liability (*Bell v. Hutsell*, 2011 IL 110724, ¶ 12). The relevant sections of the Restatement, as identified by plaintiffs, provide as follows:

"§ 323 Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking."

"§ 324A Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or

the third person upon the undertaking." Restatement (Second) of

Torts §§ 323, 324A (1965).

¶ 42    "By undertaking to act a defendant becomes subject to a duty with respect to the manner

of performance." (Internal quotation marks omitted.) *Bell*, 2011 IL 110724, ¶ 23. Although

courts have recognized a distinction in tort liability between *misfeasance* (the negligent

performance of a voluntary undertaking) and *nonfeasance* (the omission to perform a voluntary

undertaking), commentators have observed that the modern law has witnessed a considerable

weakening and blurring of the distinction. *Id*.

¶ 43    In *Bell*, 2011 IL 110724, the court analyzed, in the context of a motion to dismiss on the

pleadings, the voluntary undertaking theory of sections 323 and 324A where a mother whose son

died in a single-car accident after consuming alcohol at a house party sued the homeowners for

negligence. The plaintiff mother alleged that the homeowners voluntarily undertook at the party

their son hosted in their home a duty to prevent the underage possession and consumption of

alcoholic beverages and negligently performed that duty. Although the plaintiff mother alleged

that monitoring the possession and consumption of alcohol at the party was part of the duty

voluntarily undertaken by the homeowners, the court stated "monitoring alone obviously did

nothing to ensure 'the protection of the other's person,' or 'the protection of a third person,'

pursuant to the requisites of sections 323 and 324A of the Restatement" and "was not even a

substantial step in the undertaking." *Id*. ¶ 26 (quoting Restatement (Second) of Torts §§ 323,

324A (1965)). The court explained, "for there to be a substantial step in pursuit of the alleged

undertaking, there must have been some affirmative action taken in an attempt to prohibit

possession and consumption of alcohol, the ultimate objective of the undertaking," and the plaintiff mother failed to allege an affirmative action by the homeowners. *Bell*, 2011 IL 110724, ¶ 26.

¶ 44    Furthermore, the *Bell* court stated that even if it assumed the plaintiff mother had sufficiently pled the homeowners had commenced performance of a duty they voluntarily assumed, the alleged facts did not provide a basis for liability because they neither supported an inference that the homeowners' stated intent and subsequent inaction had increased the risk of harm to the plaintiff's son or other partygoers, nor evinced reliance or change of position on the basis of the homeowners' expressed intent. *Id*. ¶ 27. Because the homeowners took no affirmative acts to effect the aim of their expressed intention to prevent the underage possession and consumption of alcoholic beverages, and no one changed position as a result of their statement, relied upon it, or was put at an increased risk of harm or in a worse position because of it, the alleged facts did not support a basis for finding a duty undertaken or liability for violation of any such duty. *Id*. ¶ 28.

¶ 45    Moreover, holding that the homeowners could potentially be liable under the alleged facts would be an unsound policy because the imposition of "liability in this situation would only serve as a deterrent to those who would consider volunteering assistance to others." *Id*. The court concluded that the plaintiff mother failed to sufficiently allege a legal duty and basis for liability on the part of the homeowners under either section 323 or 324A of the Restatement. *Id*.

¶ 46    The court also distinguished the alleged facts in *Bell* from those in *Wakulich v. Mraz*, 203 Ill. 2d 223 (2003), and *Simmons v. Homatas*, 236 Ill. 2d 459 (2010), where the court applied Restatement principles and found that the defendants' affirmative conduct, which amounted "to an assertion of control over an inebriated and significantly impaired person, increased the risk of

harm to that person and/or created a risk of harm to others." *Id*. ¶ 29. Specifically, in *Wakulich*, 203 Ill. 2d at 243, the social hosts' liability arose from their actions of taking complete and exclusive charge of the care of an intoxicated and unconscious minor by placing her in the family room, checking on her periodically, taking measures to prevent aspiration, removing her soiled blouse, and preventing other persons present in the home from intervening on her behalf. In *Simmons*, 236 Ill. 2d at 475-76, the defendant club's liability arose from the actions of its employees, who discovered the visibly intoxicated patron vomiting in the restroom, ejected him from the club, had the club's valet retrieve the patron's car, opened the driver's side door of his car, and directed him to leave the premises immediately.

¶ 47    Here, we apply the principles of sections 323 and 324A and precedent applicable to voluntary undertakings to determine whether plaintiffs have presented a factual basis that would arguably entitle them to a judgment against Live Nation for Megan's death based on Live Nation's undertaking to provide security personnel at the concert for the protection of concertgoers and third persons. In making this determination, we must consider whether Live Nation's alleged failure to exercise reasonable care in performing its undertaking increased the risk of such harm or the harm was suffered because Lavko or Megan relied on Live Nation's undertaking. According to plaintiffs, Live Nation failed to exercise reasonable care because its inadequate security failed to (1) stop Lavko from possessing and consuming alcohol in the parking lot, (2) notice that she was extremely intoxicated during the concert and when she walked back to her car in the parking lot, and (3) prevent her from driving off the premises in that condition.

¶ 48    The duty of care that arises in a voluntary undertaking situation is limited to the extent of the undertaking. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 239 (1996) (railroad, by

making telephone calls to the police to report the presence of an unresponsive man found lying on either a bench or the floor in an unmanned commuter train warming house, did not voluntarily undertake a duty to ensure that aid would be provided to rescue the man, who later died from an acute subdural hematoma that likely resulted from an assault). Merely providing precautionary security measures does not create a voluntary undertaking to ensure an individual's safety. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 218-19 (1988) (owner and operator of office park did not voluntarily assume duty to protect tenants' employees from criminal acts of third persons by the commonplace actions of providing lighting in the common areas and assuring that locks were in working order, or even by investigating whether an allegedly unauthorized person was on the premises).

¶ 49    Here, there is no evidence that Live Nation voluntarily undertook duties to either ensure that concertgoers did not ride home from the concert with intoxicated drivers or prevent concertgoers from becoming intoxicated and driving home from the concert while under the influence of alcohol. According to the deposition testimony of Live Nation's corporate representative, the goal or objective of Live Nation's security personnel did not involve "breathalyzing people" or interjecting themselves into every situation where a concertgoer might be intoxicated. Rather, Live Nation's security personnel were responsible for monitoring the behavior of the crowd to ensure that people behaved respectfully and did not disrupt the other concertgoers' enjoyment of the event. Providing this measure of security did not create a voluntary undertaking to protect Megan from Lavko's negligent driving while intoxicated and speeding.

¶ 50    In *Bell*, the homeowners could not be liable under a voluntary undertaking theory for failing to prevent or monitor the intoxication of invitees in the absence of any facts showing that

the homeowners' affirmative conduct amounted to an assertion of control over an inebriated and significantly impaired person. *Bell*, 2011 IL 110724, ¶ 29. Similarly, Live Nation cannot be liable under a voluntary undertaking theory for failing to monitor Lavko, prevent her intoxication, and prevent her from driving away in that condition in the absence of facts showing that Live Nation's affirmative conduct amounted to an assertion of control over the inebriated Lavko. There is no evidence that Live Nation's security personnel interacted with or even noticed Lavko. Live Nation did not escort her to her car, hold the driver's side door open and direct her to leave the premises immediately.

¶ 51    The record shows that Live Nation banned tailgating and alcohol consumption in the parking lot. Also, employees were instructed to bring visibly intoxicated concertgoers to the security office to ensure they had a safe way to get home, and call police if they resisted or attempted to leave the venue in a dangerous and unsafe manner. Moreover, Live Nation's security personnel were present in the parking lot and inside the concert and identified and detained 46 concertgoers, many for apparent intoxication or alcohol-related issues. Live Nation's liability, however, is limited to the extent of its undertaking, and there is no evidence that security personnel performed those specific actions of control negligently.

¶ 52    Plaintiffs' claims of Live Nation's alleged nonfeasance for failing to notice Lavko's intoxicated condition and stop her from driving her car in that condition do not support a basis for finding Live Nation liable for a voluntary undertaking. The record does not support an inference that Live Nation's policy against tailgating and alcohol consumption in the parking lot and provision of security personnel at the concert increased the risk of harm to other concertgoers. Moreover, the record does not show reliance or change of position based on Live Nation's parking lot policy or provision of security. Lavko defied Live Nation's policy and

security by bringing a bottle of rum to the concert and driving her car while intoxicated. Also, Megan joined Lavko in consuming a large quantity of alcohol before Lavko even drove Megan and the other passengers to Live Nation's premises. Furthermore, it would be an unsound policy to hold that Live Nation could be liable for not preventing all consumption of alcohol in the parking lot and all intoxicated drivers from leaving the parking lot. The imposition of liability in this situation would serve only to deter entertainment venue operators from enacting responsible restrictions regarding the consumption of alcohol on their premises and providing security to assist concertgoers.

¶ 53                                III. CONCLUSION

¶ 54     For the foregoing reasons, we affirm the judgment of the circuit court that granted summary judgment in favor of defendants.

¶ 55     Affirmed.

**No. 1-18-1123**

| | |
|---|---|
| **Cite as:** | *Debra Elam, et al. v. O'Connor & Nakos, Ltd., et al.*, 2019 IL App (1st) 181123 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-5671; the Hon. James N. O'Hara, Judge, presiding. |
| **Attorneys for Appellants:** | George W. Spellmire and Jessica Lynn Dagley, of Spellmire Bruck LLP, of Chicago, for appellants.<br><br>Eugene J. Schiltz, of Crotty & Schiltz, LLC, of Chicago, for appellants. |
| **Attorneys for Appellees:** | Daniel F. Konicek and Amanda J. Hamilton, of Konicek & Dillon, P.C., of Chicago, for appellees. |