# Illinois Official Reports

## Appellate Court

***Stearns v. Ridge Ambulance Service, Inc.*, 2015 IL App (2d) 140908**

| | |
|---|---|
| Appellate Court Caption | SCOTT STEARNS, as Executor of the Estate of Marjorie Stearns, Deceased, Plaintiff-Appellant, v. RIDGE AMBULANCE SERVICE, INC., and JERRY BROOKS, Defendants (Countryside Care Centre, Inc., Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-14-0908 |
| Filed | May 15, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 11-L-487; the Hon. John G. Dalton, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Patrick M. Flaherty, of Kinnally, Flaherty, Krentz & Loran, P.C., of Aurora, for appellant.<br><br>Joshua M. Rosenstein and Terrence S. Carden III, both of Myers Carden & Sax LLC, of Chicago, for appellee. |

JUSTICE BURKE delivered the judgment of the court, with opinion. Justices Jorgensen and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Scott Stearns, as executor of the estate of Marjorie Stearns, deceased (Marjorie), filed a multicount complaint under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2010)) and the Survival Act (755 ILCS 5/27-6 (West 2010)) against Ridge Ambulance Service, Inc. (Ridge), Jerry Brooks, and Countryside Care Centre, Inc. (Countryside). Marjorie, who resided in a nursing home operated by Countryside, died as a result of injuries sustained while Ridge transported her back to the nursing home following treatment at an off-site dialysis center. Brooks, who was an employee of Ridge, was driving the medical transport vehicle (medi-van) in which Marjorie's injuries occurred. Countryside's successful motion for summary judgment on the claims against it gives rise to this appeal under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). We reverse and remand.

¶ 2    The pleadings, along with depositions, affidavits, and exhibits submitted in support of and in opposition to Countryside's summary-judgment motion, establish the following facts. At the time of the incident giving rise to this lawsuit, Marjorie was 89 years old and suffered from dementia. Countryside's records indicate that late in July 2009 Marjorie had been found in a kneeling position wedged between the footrests of her wheelchair. A few weeks later, Marjorie was found lying on the floor of her room. Her care plan called for the use of bed and chair alarms.

¶ 3    Countryside arranged to have Ridge transport Marjorie to a dialysis facility on September 1, 2009, but did not convey any special instructions to Ridge about Marjorie's risk of falling. Brooks was assigned to drive Marjorie on her return trip to the nursing home. Brooks testified at his deposition that he met Marjorie in a waiting area. She was seated in a wheelchair. Brooks wheeled her to the medi-van, loaded her into it using a wheelchair lift, and secured the wheelchair inside the medi-van using floor locks. Brooks then placed a safety belt around Marjorie. According to Brooks, the safety belt was attached to the medi-van's floor and ceiling and ran diagonally from Marjorie's shoulder to her hip. There was no lap belt to secure Marjorie to the wheelchair.

¶ 4    Brooks testified that Marjorie had brought a book with her. During the ride back to the nursing home, Brooks heard the book fall and Marjorie told him that it had fallen. Brooks told Marjorie that he would take care of the book and that she should not worry about it. About two minutes later, Brooks noticed that Marjorie appeared to be reaching for the book. Brooks said something to the effect of "no, don't do that, I'll get it." Seconds later Brooks saw Marjorie start to stand up. At that point another vehicle merged in front of the medi-van, forcing Brooks to brake abruptly. When Brooks did so, Marjorie fell forward and her head struck a metal object. Marjorie died about two weeks later. Ridge's medi-van supervisor, Derrick Johnson, testified at his deposition that Ridge was then (*i.e.*, at the time of the deposition) using a restraint system with a belt that ran around the passenger's torso and the

back of the passenger's wheelchair. The buckle was located behind the wheelchair. Johnson believed that this restraint system was available at the time of Marjorie's accident.

¶ 5 The nursing home's administrator, Kimberly Kohls, testified at her deposition that she was responsible for all aspects of the facility's operations, including the selection of vendors to provide transportation services for residents. She testified that chair alarms are used with patients who, for any of various reasons (including cognitive problems), might have difficulty complying with instructions to request assistance before attempting to stand from a chair.

¶ 6 Laura Westergard, a registered nurse with 30 years' experience in the field of long-term care, executed an affidavit stating that she had reviewed various documents pertaining to Marjorie and the accident that preceded her death. Westergard further stated as follows:

"Countryside *** undertook to furnish transportation for residents in connection with outside medical care by selecting a transportation vendor. Based on [Marjorie's] fall history, fall risk, [cognitive impairments,] and need for safety interventions, the standard of care required Countryside to take or ensure such precautions as would prevent her from getting out of the wheelchair during medivan transport. This could have been accomplished in several ways: Countryside could have sent someone in the medivan with [Marjorie] for supervision; Countryside could have educated Ridge (the transportation vendor) about the risks of [Marjorie] and arranged for Ridge to send in the medivan additional personnel for supervision; Countryside could have ensured use in the medivan of a seatbelt that would not allow [Marjorie] to disengage and stand up during transport."

¶ 7 Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). "The purpose of summary judgment is to determine whether a genuine issue of material fact exists, not to try a question of fact." *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). Furthermore, "[s]ummary judgment should be granted only when the right of the moving party is clear and free from doubt." *Id.* An order entering summary judgment is subject to *de novo* review. *Colburn v. Mario Tricoci Hair Salons & Day Spas, Inc.*, 2012 IL App (2d) 110624, ¶ 32.

¶ 8 The elements of a common-law cause of action for negligence are "the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). In granting Countryside's motion for summary judgment, the trial court concluded that, as a matter of law, Countryside owed no duty to protect Marjorie from the risk of injury resulting from her failure to remain seated in her wheelchair while in transit from an off-site treatment facility. Plaintiff argues that a nursing home has both a common-law and a statutory duty to exercise care to avoid injury to residents and that that duty is not categorically limited to guarding against injuries that occur on its premises. Plaintiff further contends that the trial court "misapprehended the distinction between duty and standard of care and erroneously applied a duty analysis to what is a standard of care issue."

¶ 9 Illinois courts have long struggled with the concept of duty, which has been described as " 'very involved, complex and indeed nebulous.' " *Id.* at 435 (quoting *Mieher v. Brown*, 54 Ill. 2d 539, 545 (1973)). Professor Dan B. Dobbs, a leading authority on tort law, has noted

that lawyers and judges sometimes "use duty to refer to a general standard or obligation" whereas at other times they "use duty as a conclusion about whether the defendant's particular act or omission should be actionable, irrespective of any general standard." 1 Dan B. Dobbs, The Law of Torts § 226, at 577 (2001), *cited with approval in Marshall*, 222 Ill. 2d at 436.

¶ 10    In *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶¶ 18-21, our supreme court offered the following summary of the principles governing the determination of whether a duty exists:

"As we have held in the past, '[t]he touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a *relationship* to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff.' (Emphasis added.) [Citations.] The 'relationship' referred to in this context acts as a shorthand description for the sum of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. [Citations.] The determination of such a 'relationship,' as sufficient to establish a duty of care, requires considerations of policy inherent in the consideration of these four factors and the weight accorded each of these factors in any given analysis depends on the circumstances of the case at hand. ***

Generally, individuals (and businesses) do not owe an affirmative duty to protect or rescue a stranger. [Citation.] However, this court has long recognized that 'every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons.' [Citations.] Thus, if a course of action *creates* a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. This does not establish a 'duty to the world at large,' but rather this duty is limited by the considerations discussed above. ***

Even when one has not created the risk of harm, a duty to take affirmative action to aid another may arise where a legally recognized 'special relationship' exists between the parties. [Citation.] Such duties are, indeed, premised upon a relationship between the parties that is independent of the specific situation which gave rise to the harm. We have recognized four relationships that give rise to an affirmative duty to aid or protect another against an unreasonable risk of physical harm: 'common carrier and passenger, innkeeper and guest, custodian and ward, and possessor of land who holds it open to the public and member of the public who enters in response to the possessor's invitation.' ***

Thus, the duty analysis must begin with the threshold question of whether the defendant, by his act or omission, contributed to a risk of harm to this particular plaintiff. If so, we weigh the four factors to determine whether a duty ran from the defendant to the plaintiff: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. If the answer to this threshold question is 'no,' however, we address whether there were any

recognized 'special relationships' that establish a duty running from the defendant to the plaintiff." (Emphases in original.)

¶ 11     These standards do not necessarily resolve the confusion noted by Professor Dobbs and the *Marshall* court about whether "duty" encompasses rules of broad applicability or is, to the contrary, a highly fact-specific inquiry into whether a particular act or omission is actionable in a particular set of circumstances. In certain settings–motor-vehicle-accident cases, for example–it is not unusual to encounter duty rules of broad applicability. For instance, in *Mulloy v. American Eagle Airlines, Inc.*, 358 Ill. App. 3d 706, 713 (2005), it was stated that "[t]he operator of a motor vehicle has the duty to use ordinary care to avoid injuring a pedestrian." The *Mulloy* court did not attempt to tailor a duty rule to the specific circumstances of the case (although the court upheld a directed verdict on the basis that there was insufficient evidence from which the jury could conclude that the driver of the vehicle in question had breached the standard of ordinary care). *Id.* at 715-16.

¶ 12     *Lance v. Senior*, 36 Ill. 2d 516 (1967), reflects a more fact-specific duty analysis. In *Lance*, the plaintiff was a nine-year-old boy afflicted with hemophilia. In his complaint he alleged that, while he was a guest in the defendants' home, they " 'negligently and carelessly permitted and allowed' the plaintiff to play with a needle 'which was caused to and did get into the throat of the plaintiff and was thereafter sucked into the inner part of the plaintiff's lung.' " *Id*. at 517. The trial court dismissed the complaint on the basis that the duty owed by the defendants was only to refrain from willfully or wantonly injuring the plaintiff. The Appellate Court, First District, reversed, holding that ordinary negligence principles applied and that the case presented a question of foreseeability for the jury to decide. *Lance v. Senior*, 66 Ill. App. 2d 41 (1966). Our supreme court reversed the appellate court, reasoning as follows:

"In many negligence cases no more than foreseeability is involved. And because so many actions grounded upon negligence involve familiar patterns of conduct, it is easy to forget that implicit in an allegation of negligence is the assertion of a failure to comply with the standard of care that the law requires–the assertion of a duty and its breach. [Citations.] In the present case, for example, implicit in the allegation that the defendants 'negligently and carelessly permitted and allowed the plaintiff to play with a needle', is an assertion that the law imposed a duty upon the defendants to guard against the risk that a nine-year-old boy who was a guest in their home, would swallow or otherwise ingest a needle.

After the event, hindsight makes every occurrence forseeable [*sic*], but whether the law imposes a duty does not depend upon forseeability [*sic*] alone. The likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant, must also be taken into account. In the present case the risk that a nine-year-old boy would swallow or otherwise ingest a needle is minimal. The allegation that the defendants knew that the plaintiff was a hemophiliac does not justify the imposition of this duty, for it suggests that the plaintiff, who was not alleged to be mentally defective, would have been taught to guard against the special hazards to which his condition made him particularly vulnerable. The burden sought to be imposed upon the defendants is a heavy one, which would require intimate and constant surveillance. The existence of such a legal obligation, if generally known, would discourage persons in the position of the

defendants from affording opportunities for children like the plaintiff to mingle with others, and would tend to isolate those children in their own homes. For these reasons, we hold that the complaint was properly dismissed because it does not allege facts upon which a recovery may be had." *Lance*, 36 Ill. 2d at 518-19.

¶ 13    In recent years, our supreme court has indicated (at times somewhat indirectly) that the weight to be given to each of the four factors in the duty analysis (foreseeability of the injury, likelihood of the injury, magnitude of the burden of guarding against the injury, and consequences of placing the burden on the defendant) depends on the facts of a given case. See, *e.g.*, *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 14; *Simpkins*, 2012 IL 110662, ¶ 18. However, in *Marshall*, our supreme court recognized that purely *ad hoc* determinations that a defendant has a duty to perform or refrain from performing particular acts improperly conflate the concepts of duty and breach. *Marshall*, 222 Ill. 2d at 443. As the *Marshall* court observed, "Courts could, after all, 'state an infinite number of duties if they spoke in highly particular terms,' and while particularized statements of duty may be comprehensible, 'they use the term duty to state conclusions about the facts of particular cases, not as a general standard.' " *Id.* (quoting 1 Dan B. Dobbs, The Law of Torts § 226, at 577 (2001)).

¶ 14    In *Marshall*, the plaintiff's decedent was fatally injured when a motor vehicle crashed through the wall of the Burger King restaurant where he was eating. The plaintiff sought recovery both from the Burger King Corporation and from the franchisee that operated the restaurant, alleging that they failed to design the structure to withstand the impact from a motor vehicle or to place concrete pillars or poles outside the structure as protective barriers. The defendants argued that they owed no duty to the decedent to protect him from the risk that an out-of-control motor vehicle would crash into the restaurant and strike him. Our supreme court held that "[b]ased on the allegations in plaintiff's complaint, the duty of care that a business invitor owes to invitees to protect them against the unreasonable risk of physical harm is clearly applicable to this case." *Id.* at 440. The *Marshall* court expressly declined to frame the duty in more specific terms, *i.e.*, as a duty to install concrete pillars or poles. *Id.* at 443 ("the issue in this case is not whether defendants had a duty to install protective poles, or a duty to prevent a car from entering the restaurant, or some such other fact-specific formulation").

¶ 15    Here Countryside argues for a fact-specific formulation of duty. Countryside argues that the first two factors in the traditional duty analysis–the foreseeability and likelihood of the injury–militate against imposing a duty on Countryside. Countryside stresses that the record shows that Ridge had transported Marjorie to and from the dialysis center, without incident, on numerous occasions prior to September 1, 2009. Countryside further argues that the magnitude of the burden of guarding against the injury and the consequences of placing that burden on Countryside also militate against imposition of a duty. Countryside contends that, because Marjorie was injured while *returning* from off-site dialysis treatment, it had no opportunity either to instruct her driver (Brooks) about any special precautions for Marjorie's safety or to inspect the medi-van. Countryside argues that sending an aide along with Marjorie "would negate the entire purpose of hiring a licensed transportation service with experience and expertise in transporting medical patients and long-term care residents." Moreover, according to Countryside, imposing such a duty "would disrupt the feasibility and cost-effectiveness for businesses utilizing the services of independent contractors providing transportation services, as well as a host of other specialized services." Countryside

acknowledges only a duty to exercise care in selecting a vendor to provide transportation services, seemingly renouncing the possibility of liability on any other basis for harm befalling a resident while in transit.

¶ 16   The rule that would emerge from Countryside's analysis is that, where a nursing-home resident has been transported off-site in the past, without incident, by a properly vetted third-party transportation service, the nursing home has no duty: (1) to inspect the vehicle in which the resident will be returning to the nursing home; (2) to instruct the driver of that vehicle about any precautions for the resident's safety; or (3) to have a nursing-home employee accompany the resident. However, as noted, duties are not to be formulated so narrowly. And indeed, even in this context, this court has stated, in far broader terms, that "[t]he proprietors of a convalescent home, somewhat like those of a private hospital, are under a duty to exercise reasonable care to avoid injury to patrons, and the reasonableness of such care is to be assessed in the light of the patron's physical and mental condition." *Stogsdill v. Manor Convalescent Home, Inc.*, 35 Ill. App. 3d 634, 662 (1976). We added that "a hospital is required ' ["]to conform to the legal standard of reasonable conduct in the light of the apparent risk.["] ' " *Id.* (quoting *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 331 (1965), quoting William L. Prosser, The Law of Torts, at 331 (3d ed. 1964)).

¶ 17   Neither *Stogsdill* nor *Darling* explained whether the duty was predicated on the four factors discussed in *Lance*, *Marshall*, and *Simpkins* (*i.e.*, foreseeability of the injury, likelihood of the injury, magnitude of the burden of guarding against the injury, and consequences of placing the burden on the defendant) or on a special relationship between the parties.[1] In the case of a nursing home, recognition of a duty would appear to be appropriate on either basis. There can be no doubt that nursing-home residents are at a foreseeable risk of, and likely to sustain, any of a variety of injuries if appropriate precautions are not taken. We note that the foreseeability factor focuses on " 'the general character of the event or harm *** not its precise nature or manner of occurrence.' " *Marshall*, 222 Ill. 2d at 442 (quoting *Bigbee v. Pacific Telephone & Telegraph Co.*, 665 P.2d 947, 952 (Cal. 1983)). Further, it would be incongruous to hold that guarding against *the general class of risks* faced by nursing-home residents is too great a burden to impose on nursing homes.

¶ 18   In any event, as noted, our supreme court has recognized four special relationships that give rise to a duty of care. *Simpkins*, 2012 IL 110662, ¶ 20. Although, to our knowledge, Illinois courts have not specifically identified the relationship between a nursing home and one of its residents as a "special relationship," it is possible that, in addition to the four that have been recognized, there may be other special relationships that give rise to a duty. See *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill. 2d 552, 559-60 (1975). Moreover, the relationship between a nursing home and a resident can be viewed as a specific instance of the "custodian and ward" relationship. "A special relationship exists where, *inter alia*, one voluntarily takes

---

[1]In *Simpkins*, 2012 IL 110662, ¶ 21, the supreme court indicated that these standards are not alternative but rather depend on the answer to the "threshold question" of whether the defendant contributed to the risk of harm to the plaintiff. Subsequently, however, in *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶¶ 22-35, the court seemed to treat the standards as alternative, without asking the "threshold question." At least in this context, we do likewise.

custody of another so as to deprive the other of his normal opportunities for protection." *Platson v. NSM, America, Inc.*, 322 Ill. App. 3d 138, 146 (2001). The term "custody" is not used in a particularly technical sense. For instance, in *Platson*, we held that allegations that a high school student worked for a business under a work-study program sponsored by her school were sufficient to show a special relationship giving rise to a duty on the business's part to protect the student from sexually predatory behavior by one of the business's employees. A physically infirm and cognitively impaired nursing home resident depends upon the staff of the nursing home to prevent injury. The relationship is sufficiently custodial to give rise to a duty.

¶ 19    The fact-specific analysis undertaken by Countryside conflates the issues of duty and breach. See *Marshall*, 222 Ill. 2d at 443. Countryside owed Marjorie a duty of care. What Countryside should or could have done to protect Marjorie bears on the question of whether Countryside *breached* its duty. And on the record here, that is a question of fact. The factual determination whether Countryside exercised due care is not amenable to artificial and arbitrary rules that insulate Countryside from liability for anything other than negligence in selecting a transportation service. Plaintiff does not seek to hold Countryside vicariously liable for the negligence of the other defendants; he seeks the opportunity to show Countryside's *own* negligence in failing to properly communicate with those defendants or to provide additional personnel to assist the other defendants in protecting Marjorie from harm while in transit. Plaintiff is entitled to present these theories of negligence to a jury.

¶ 20    Countryside argues that summary judgment was appropriate for the alternative reason that the record shows that plaintiff cannot establish the element of proximate cause. A party seeking summary judgment bears an initial burden of production that can be met in either of two ways: "(1) by affirmatively disproving the plaintiff's case by introducing evidence that, if uncontroverted, would entitle the movant to judgment as a matter of law (traditional test) [citation], or (2) by establishing that the nonmovant lacks sufficient evidence to prove an essential element of the cause of action (*Celotex* [*Corp. v. Catrett*, 477 U.S. 317 (1986),] test) [citations]." *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 688-89 (2000). "Only if a defendant satisfies its initial burden of production does the burden shift to the plaintiffs to present some factual basis that would arguably entitle them to judgment under the applicable law." *Id.* at 689.

¶ 21    Countryside maintains that it is entirely speculative that any of the precautions that plaintiff's expert recommended would have prevented the accident. In this respect, Countryside treats its summary-judgment motion as a *Celotex*-type motion. The introductory section of Countryside's memorandum of law in support of its motion for summary judgment contained the cursory assertion that "[t]here is no evidence or testimony whatsoever in this case to show that *** any action or inaction of Countryside or its staff proximately caused [Marjorie's] injury." However, the remainder of Countryside's memorandum of law focused on whether Countryside owed Marjorie a duty of care. The bare assertion that plaintiff could not establish proximate cause was insufficient to shift the burden to plaintiff to come forward with evidence of proximate cause. *Id.* at 690.

¶ 22    For the foregoing reasons, the judgment of the circuit court of Kane County is reversed and the cause is remanded for further proceedings.

¶ 23    Reversed and remanded.