2024 IL App (1st) 231373-U

Fourth Division
Filed November 21, 2024

No. 1-23-1373

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| TRUDY TAYLOR, <br>     Plaintiff-Appellant, <br><br>   v. <br><br> THE BOARD OF EDUCATION OF THE <br> CITY OF CHICAGO and KAREN SAFFOLD, <br>     Defendants-Appellees. | Appeal from the <br> Circuit Court of Cook County <br><br> No. 2021 L 009050 <br><br> The Honorable Patrick J. Sherlock, <br> Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1   *Held:*  The entry of summary judgment against plaintiff, who had been discharged from her position as interim principal at an elementary school, was affirmed where she failed to show the existence of a genuine factual dispute on the merits of her claims against the school board for retaliatory discharge and against her former supervisor for tortious interference.

¶ 2   Plaintiff Trudy Taylor filed a two-count complaint raising claims of retaliatory discharge in violation of public policy against her former employer, the Board of Education of the City of Chicago (the Board), and tortious interference with prospective economic advantage against her former supervisor, Board employee Karen Saffold. The trial court granted the defendants' joint motion for summary judgment, and Taylor appealed. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. The Underlying Events

¶ 5     The following undisputed facts are disclosed by the record.

¶ 6     Taylor worked in the Chicago Public Schools (CPS) for more than 30 years as a teacher, as an assistant principal, and then as a principal. In 2013, the school where Taylor worked as the principal closed, and she was reassigned to duties as an interim principal for schools without a regular principal under contract. During the summer of 2015, she was assigned to serve as interim principal at George Washington Carver Elementary School (Carver). Before the start of the school year, Carver was moved into a new administrative subdivision known as a "network." The chief of the new network was Saffold, who had previously supervised Taylor as the principal of an elementary school where Taylor taught.

¶ 7     By the end of October 2015, Saffold had concluded that Taylor should be removed from her role as interim principal of Carver. Saffold's assessment of Taylor's performance was set out in a memorandum dated October 27, 2015, which concluded that Taylor "had failed to meet the basic expectations to lead the school" and recommended "ending the assignment" and replacing Taylor with somebody else. After consulting with Elizabeth Kirby, who supervised the network chiefs, Saffold issued Taylor a one-page memorandum of understanding on November 4, 2015. The memorandum of understanding identified several "[i]nstructional concerns" about Taylor's performance as interim principal and specified a series of "[e]xpectations moving forward" that Saffold had for Taylor's supervision of teachers and academics at Carver.

¶ 8     Around the same time that Saffold gave Taylor the memorandum of understanding, the local school council (LSC) for Carver was interviewing candidates for the four-year contract principal position. Taylor was one of the applicants. Taylor received six of the ten votes cast at the LSC's December 2015 meeting, but that fell one vote shy of the required supermajority. The LSC referred the final decision to CPS's chief executive officer, who delegated it to then-Chief Education Officer Janice Jackson. Jackson, assisted by Kirby, interviewed Taylor and the second-

place candidate. After the interviews, they recommended hiring neither candidate, and they also recommended that Taylor be removed immediately from her position as interim principal at Carver. The Board adopted both recommendations. Taylor was summoned to Saffold's office on January 20, 2016, and given a notice of dismissal. Despite these adverse decisions, Taylor remained eligible to be hired as a principal by schools in CPS, including Carver.

¶ 9    After Taylor was fired, she asked to meet with Kirby, for whom she had worked in the past. Kirby agreed, and they met at Kirby's office on February 9, 2016. What transpired during this meeting is disputed, as discussed below.

¶ 10                                B. Pleadings

¶ 11    In December 2016, Taylor filed a complaint in federal court raising a variety of claims under both state and federal law, including the two state-law claims at issue in this appeal. Those two claims survived a motion for summary judgment (see Fed. R. Civ. Pro. 56 (eff. Dec. 1, 2010)), but her federal claims did not, and, in September 2020, the federal court dismissed Taylor's remaining state-law claims without prejudice for lack of jurisdiction.

¶ 12    Exactly 364 days later, Taylor filed the underlying two-count complaint in the circuit court of Cook County. In general, the complaint alleged that Saffold had harbored a grudge against Taylor since 2006 over Taylor's vote against Saffold's preferred candidate for an assistant principalship at an elementary school where Taylor taught and served as a teacher representative on the LSC. It alleged that, over the ensuing years, Saffold had tried to sabotage Taylor's career in various ways, eventually succeeding in getting Taylor fired from Carver. Count I of the complaint was against the Board for retaliatory discharge against public policy. It alleged that, on February 9, 2016, Kirby disclosed to Taylor that one of the reasons she had been fired was that a clerk at Carver had "made too much money" during summer and winter breaks in 2015. It further alleged that the meaning of the remark was that Taylor was fired "for her activities in approving payments to workers at Carver for services that were lawfully rendered, including payments for minimum wage and overtime," in accordance with the requirements of "Illinois and federal minimum and

overtime law." Count II of the complaint was against Saffold for tortious interference with prospective economic advantage. It alleged that Saffold had induced the Carver LSC not to award the four-year principal contract to Taylor by discouraging LSC members from voting for her through intimidation and inappropriate visits to the school. It also alleged that Saffold had induced the Board to pass over Taylor for the Carver contract and terminate her employment as interim principal by "making unfavorable, false, and unjustified comments about Taylor's performance" to her superiors and by "falsely suggesting *** that Taylor had overpaid her clerk at Carver."

¶ 13    In their answers, the Board and Saffold raised, as affirmative defenses, a variety of theories of immunity under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2016)).

¶ 14                                    C.  Summary Judgment

¶ 15    In April 2023, the Board and Saffold filed a joint motion for summary judgment in their favor on Taylor's claims, both on the merits and on their affirmative defenses of immunity. The motion was supported by 26 exhibits, including Saffold's affidavit, an unsworn declaration under penalty of perjury submitted by Saffold during federal-court proceedings,[1] transcripts from several depositions taken in both the federal and state cases, and documentary evidence relevant to the underlying events. We recite only the arguments and evidence relevant to our disposition of this appeal.

¶ 16    With respect to the retaliatory-discharge claim, the Board argued that Taylor could not produce any evidence proving that she was fired for complying with minimum-wage and overtime laws. It contended that the only evidence that Taylor could muster that she was fired for that reason would be her own testimony that, when she met with Kirby on February 9, 2016, Kirby told her

---

[1]    Similar to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2022)), federal statutory law permits unsworn written statements to be given the same effect as sworn affidavits provided the person making the statement declares, under penalty of perjury, that the matters stated are true. See 28 U.S.C. § 1746. It is not immediately clear whether such statements may be treated as affidavits in Illinois court proceedings, but neither party has challenged their sufficiency.

that one reason she had been dismissed from Carver and denied the principal contract was that Saffold had told Kirby that Taylor "paid [her] clerk too much money over the Christmas break." According to the Board, this remark was too vague to support Taylor's interpretation of it as meaning that she was fired for complying with wage laws, rendering her theory mere speculation.

¶ 17    With respect to the tortious-interference claim, Saffold argued that Taylor could not carry her burden of showing that Saffold engaged in the kind of improper conduct necessary to prove that claim or that any improper conduct was the cause of Taylor's termination and the Board's decision not to award her the Carver contract. First, Saffold contended that there was no evidence that she improperly communicated with any members of the Carver LSC about the vote on the principal contract. In support, she cited her own affidavit, which stated that, other than reviewing a draft of the job description at the LSC's request, she never communicated with any member of the LSC about the selection of a principal. She also relied on the deposition testimony of the two teacher representatives on the LSC, Joshua Prioleau and Karen Hearon-Clark, who both testified that Saffold never talked to them about the selection process or tried to influence their votes. Second, Saffold contended that no jury could reasonably conclude that the memorandum of understanding or her other statements to Kirby about Taylor's job performance were improper. In support, she cited her own affidavit, in which she averred that the information found in the memorandum of understanding was, to the best of her knowledge, accurate and truthful. Third, Saffold contended that, because she did not learn about any financial malfeasance at Carver until after Taylor was fired, she could not have used that knowledge to influence the decisions to fire Taylor and to reject her candidacy for the Carver principal contract. She supported this argument with her own affidavit and federal declaration, in both of which she asserted that she first learned about the financial issues on January 27, 2016, which was after Taylor's termination.

¶ 18    Taylor filed a response to the motion for summary judgment, which she supported with ten exhibits, including deposition transcripts and documentary evidence. With respect to the retaliatory-discharge claim, Taylor did not put forward any additional evidence to support her allegation that she was fired for complying with minimum-wage and overtime laws. She only

argued that a reasonable jury could adopt her interpretation of Kirby's remark. She also argued that a reasonable jury could conclude that Saffold, who was responsible for overseeing Carver's finances, discovered the overpayment issue earlier than she claimed and communicated it to Kirby before Taylor was fired. This argument relied on the assertion that "[t]here was an audit of Carver in November 2015," which Taylor supported with a screenshot of a text message sent to her by Karen Hearon-Clark asking, "Why would they do an audit when u [sic] aren't there I don't understand that what are they trying to do?"[2]

¶ 19    With respect to her tortious-interference claim, Taylor first argued that there was evidence showing that Saffold did, in fact, communicate with LSC members about Taylor's candidacy for the Carver contract. She relied on her own deposition testimony and her federal declaration, in which she asserted that, although LSC members and Toylee Green (a liaison between CPS and the Carver LSC) initially viewed her candidacy favorably, their support waned over time; that, at the same time, she observed both Prioleau and Hearon-Clark developing friendlier, more-familiar relationships with Saffold; and that LSC member Yvonne Scott Evans told Taylor that she was getting "nervous" and wanted to "hurry up and get a quorum" because she was receiving nighttime phone calls from Saffold and Green. Taylor did not, however, support her response with either an affidavit from Evans or any testimony given by Evans. Second, Taylor argued that a jury could find that Saffold engaged in improper conduct by providing false information about Taylor's job performance to Kirby, leading to the Board's decisions not to award Taylor the Carver contract and to end her assignment as interim principal. In support, she cited Kirby's state-court deposition testimony that, before she and Jackson interviewed Taylor, she discussed Taylor's performance as interim principal with Saffold, who "had some concerns." Taylor also cited her own state-court

_____

[2]    The record does not disclose the date this message was sent, but the next series of messages was initiated on November 16, and the context suggests that it was sent at or around the time that the LSC held a candidate forum while Taylor was on bereavement leave, placing it in the first half of November 2015.

deposition testimony that she "refuted" the memorandum of understanding during her interview with Kirby and Jackson.

¶ 20    The trial court granted the motion for summary judgment and entered summary judgment against Taylor on both counts of her complaint. It agreed that the Board was immune from liability for retaliatory discharge under section 2-109 of the Tort Immunity Act because the decision to fire Taylor had been an exercise of discretion. It also found that Taylor's theory that she was fired for complying with minimum-wage and overtime laws was not a legally valid basis on which to claim retaliatory discharge and that evidence adduced by the Board showed that Taylor was terminated before the Board learned about any financial improprieties at Carver. As for the tortious-interference claim, the court found that Taylor had failed to refute Saffold's immunity defense with evidence that Saffold's allegedly tortious conduct fell outside the scope of her employment or that she had acted with "actual malice." On the merits of that claim, the court agreed with Saffold that her employment with the Board meant that her conduct could not be "third-party interference." It also found that Taylor had not put forward evidence showing that Saffold had improperly influenced the vote of any LSC members, that Saffold's provision of the memorandum of understanding to her superiors was improper, or that Saffold had learned about the financial problems at Carver before Taylor's termination. Additionally, while acknowledging that it could infer that the memorandum of understanding "played a role" in Kirby and Jackson's decision-making, the court found that it could "also infer" that Taylor's poor showing at the interview and lack of a plan to improve Carver was decisive. Accordingly, the court entered judgment against Taylor on both counts.

¶ 21                                     II.  ANALYSIS

¶ 22    On appeal, Taylor argues that the trial court erred by granting the motion for summary judgment as to both of her claims. We review the trial court's decision to grant a motion for summary judgment *de novo*. *Thounsavath v. State Farm Mutual Automobile Insurance Co.*, 2018 IL 122558, ¶ 15.

¶ 23    "The purpose of summary judgment is not to try a question of fact, but to determine whether a genuine issue of material fact exists." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). Summary judgment is appropriate if "the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Thounsavath*, 2018 IL 122558, ¶ 15. "Because summary judgment is a drastic means of disposing of litigation, a court must exercise extraordinary diligence in reviewing the record so as not to preempt a party's right to fully present the factual basis for its claim." *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 305. At this stage, plaintiffs need not prove their cases, and summary judgment should be granted only if "the right of the moving party is clear and free from doubt." *Id.*

¶ 24    On a motion for summary judgment, the movant has an initial burden of production. *Stearns v. Ridge Ambulance Service, Inc.*, 2015 IL App (2d) 140908, ¶ 20. It can meet that initial burden by putting forward evidence that, if left uncontroverted, would entitle it to judgment as a matter of law. *Id.* A defendant can also meet its initial burden by establishing that the plaintiff lacks sufficient evidence to prove one or more elements of its claim. *Id.* Once the movant satisfies its initial burden, the onus shifts to the nonmoving party to "present a factual basis that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002).

¶ 25                                  A.  Retaliatory Discharge

¶ 26    Taylor first argues that the trial court erred by granting the Board's motion for summary judgment on her retaliatory-discharge claim. "To sustain a cause of action for retaliatory discharge, an employee must prove: (1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities (causation), and (3) the discharge violates a clear mandate of public policy." *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376, ¶ 31. There is no dispute that the Board discharged Taylor from her position as interim principal, so only the elements of causation and violation of public policy are at issue.

¶ 27    Taylor's retaliatory-discharge claim is based on the remark that she alleges Kirby made during their February 2016 meeting about Taylor overpaying her clerk. According to Taylor's deposition testimony, Kirby responded to Taylor's description of all the good work she had done by saying, "[B]ut you paid your clerk too much money over the Christmas break, Dr. Saffold said." Taylor alleges in her complaint that this remark meant that she was discharged, at least in part, because "she complied with state and federal laws that require employees to be paid minimum wage and overtime for services that are lawfully rendered." See, *e.g.*, 820 ILCS 105/4 (establishing minimum wage); *id.* § 4a (requiring time-and-a-half for overtime). That allegation is crucial to her claim because, under the common-law doctrine of employment at will, employees without a contract "serve[ ] at the employer's will, and the employer may discharge such an employee for any reason or no reason." *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 32 (1994). The tort of retaliatory discharge "is a very narrow exception" to that doctrine. *Krum v. Chicago National League Ball Club, Inc.*, 365 Ill. App. 3d 785, 788 (2006). It is available only when, "for reasons of public policy, a limitation on the employer's ability to freely discharge an at-will employee" is merited. *Zimmerman*, 164 Ill. 2d at 32 (citing *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978)). Hence, an essential element of retaliatory discharge is that the termination of employment contravened some "clear mandate of public policy." *Michael*, 2014 IL 117376, ¶ 31. The statutory requirement of paying minimum wage is the only such policy that Taylor has identified. Assuming, without deciding, that a manager's compliance with minimum-wage laws is a protected activity for purposes of retaliatory discharge, Kirby's alleged belief that Taylor had allowed a Carver employee to be paid too much money did not, on its own, entitle Taylor to relief—even if, as she argues, that was a pretext that Saffold used to push for her desired outcome. Taylor's own theory would require her to prove that the basis for her discharge was her adherence to the legal obligation to pay employees a minimum wage for regular and overtime work.

¶ 28    At her deposition, Taylor acknowledged that, other than Kirby's isolated remark, she had no evidence that she was fired merely for authorizing the payment of the minimum wages required by law:

"Q. Other than the conversation you had with Ms. Kirby on February 9th, 2016, do you have any other evidence in support of your claim that you were fired for paying your clerk during Christmas break?

A. No."

When the Board moved for summary judgment on Taylor's retaliatory-discharge claim, it argued that Kirby's remark that Taylor "paid [her] clerk too much money over the Christmas break" was not itself sufficient to establish that Taylor was fired for complying with minimum-wage laws. We agree. Even if Kirby's remark arguably showed that payments to her clerk may have been one of the reasons why the Board decided to terminate her as the interim principal at Carver, it neither disclosed nor suggested that the problem was that Taylor was paying people for work they had done as opposed to, for example, authorizing the work to be done in the first place or failing to realize that her office staff were collecting paychecks for working while the school was supposed to be closed. Taylor's subjective interpretation of Kirby's alleged remark as meaning that she was fired because she complied with the minumum-wage laws is, at best, speculation, and "something more than mere speculation is required to survive a motion for summary judgment." *Cole v. Paper Street Group, LLC*, 2018 IL App (1st) 180474, ¶ 47. The Board therefore met its initial burden of showing that Taylor's evidence was "insufficient to avoid judgment as a matter of law." *Jiotis*, 2014 IL App (2d) 121293, ¶ 25.

¶ 29    At that point, the burden shifted to Taylor to present a factual basis that would arguably entitle her to judgment. *Stearns*, 2015 IL App (2d) 140908, ¶ 20. But her response to the summary-judgment motion did not identify any evidence supporting her subjective interpretation of Kirby's remark. Neither do her briefs on appeal. Once the burden shifted to Taylor, she failed to carry it. The trial court correctly entered summary judgment in favor of the Board on this claim.[3]

---

[3]    Because Taylor's retaliatory-discharge claim fails on the merits, we do not need to consider whether the Board was entitled to summary judgment on the basis of immunity.

¶ 30                                  B.  Tortious Interference

¶ 31     Taylor next argues that the trial court erroneously granted the motion for summary judgment on her claim that Saffold tortiously interfered with her employment as interim principal at Carver and her prospect of winning the four-year principal contract for Carver. Taylor contends that the court erred by finding that Saffold was not a third party, that she failed to put forward evidence that Saffold's conduct was improper, false, or malicious, and that she failed to show that Saffold's conduct caused her to lose the Carver contract.

¶ 32     "To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996). There is no dispute that Taylor expected to win the four-year contract to serve as Carver's principal or that Saffold was aware of Taylor's candidacy.[4]

¶ 33     When Saffold moved for summary judgment on the basis that Taylor could not prove intentional and unjustified interference, she observed that Taylor had advanced three theories as to how Saffold's conduct had led to her loss of the interim principalship and four-year contract: (1) that Saffold improperly swayed Carver LSC members to vote against Taylor's candidacy for the principal contract, (2) that the memorandum of understanding prepared by Saffold led Kirby and Jackson to believe that Taylor was not competent to serve as principal at Carver, and (3) that Saffold told Kirby that Taylor's "clerk made too much money over the Christmas break." Among

---

[4]     We acknowledge that, on appeal, Saffold argues that Taylor's hope of receiving the Carver contract was not a sufficient expectation, but she did not move for summary judgment in the trial court on that basis. An appellee may raise an issue for the first time on appeal to sustain the trial court's judgment, but only if "the factual basis for the issue was before the trial court." *DOD Technologies v. Mesirow Insurance Services, Inc.*, 381 Ill. App. 3d 1042, 1050 (2008). And a motion for summary judgment should not be granted on a basis not raised by the movant because doing so would deprive the nonmovant the opportunity to produce evidence showing that there is a genuine factual dispute on that issue. See *Miwel, Inc. v. Kanzler*, 2019 IL App (2d) 180931, ¶¶ 9-14. Accordingly, we decline to affirm on this basis.

the materials Saffold relied on in her motion for summary judgment was her own affidavit, which addressed all three of Taylor's theories. First, Saffold attested that her only communication with any LSC members about the principal contract was her response to the LSC's request that she review the job description it had prepared for the position. Second, Saffold attested that the information found in the memorandum of understanding was accurate and truthful to the best of her knowledge, not false. Third, Saffold attested that the information about potential financial malfeasance at Carver that she disclosed to others, including Kirby and the Board's law department, had come from a member of Saffold's staff who, after being asked by Saffold to investigate a negative budget balance at Carver, informed Saffold that several Carver employees had been paid from a fund that was ostensibly for extended day programs, which Carver did not have. As of January 27, 2016, a total of $24,381 had been paid from that fund, all but $5,000 of which had been transferred into the fund with Taylor's authorization. Saffold averred that, in her view, "this amount, over $24,000, was excessive because there were no extended day programs at Carver," which was a reasonable conclusion that certainly justified an assessment that Taylor had paid her clerk (who had, according to an exhibit attached to the defendants' motion for summary judgment, been paid more out of that fund than any other staff member) too much money. Left unrebutted, this evidence was sufficient to show that Saffold was entitled to judgment as a matter of law on Taylor's tortious-interference claim. Thus, Saffold met her initial burden on her motion for summary judgment.

¶ 34    The question becomes whether Taylor showed that there was a material issue of fact or that there was evidence arguably entitling her to judgment on her tortious-interference claim. We find that she did not.

¶ 35    First, Taylor has not put forward any admissible evidence arguably showing that Saffold discussed Taylor's candidacy for the principal contract with any member of the Carver LSC. During her depositions, Taylor testified that LSC president Yvonne Scott Evans told her that she had been receiving late-night calls about Taylor from Saffold and another CPS administrator. That testimony, however, is inadmissible hearsay; it cannot defeat a motion for summary judgment.

*Prodromos v. Everen Securities, Inc.*, 341 Ill. App. 3d 718, 728 (2003). Taylor did not produce an affidavit from Evans or deposition testimony given by Evans, and she has pointed to no other evidence arguably contradicting Saffold's affidavit on this point.

¶ 36   Second, Taylor has not put forward any admissible evidence arguably showing that Saffold knowingly communicated false information about Taylor's job performance to Kirby or Jackson, either in formal memoranda or through informal conversations. At the outset, we note that, at trial, Taylor would not have to show merely that Saffold communicated false or inaccurate information about Taylor's job performance; she would have the burden of proving that any false statements were deliberate lies. That is because conduct that is merely negligent or even reckless is not actionable as tortious interference. Restatement (Second) of Torts § 766C & cmt. d (1979). This principle is consistent with the general rule of Illinois law that "a party may not recover in negligence for a purely economic loss." *Olson v. Hunter's Point Homes, LLC*, 2012 IL App (5th) 100506, ¶ 8 (citing *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 86-87 (1982)). Essentially, Taylor can only recover for Saffold's allegedly false statements about her job performance if those statements amounted to fraudulent misrepresentations. See Restatement (Second) of Torts, § 767, cmt. c (1979) ("Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper.").

¶ 37   In her response to the motion for summary judgment, Taylor merely asserted, without further explanation, that "Saffold arguably provided false information *** regarding Taylor's performance as principal of Carver." The response did not specify what information was false, and we have already explained that merely communicating false information, on its own, would not be actionable as tortious interference. On appeal, Taylor elaborates somewhat, asserting that Saffold (1) "told [Kirby and Jackson] that Taylor had not addressed and completed the expectations and performance issued raised in Saffold's [memorandum of understanding]," (2) "failed to tell Kirby and Jackson of [Taylor's] efforts to correct the alleged deficiencies," (3) "failed to advise Jackson and Kirby of Taylor's accomplishments," and (4) "failed to advise them how Taylor had engineered change at Carver by implementing and following the Continuous Improvement Work Plan" that

Saffold had given her. These assertions, however, are not supported by citations to the record, which means they are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring arguments in briefs to cite "the pages of the record relied on"); *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 57 (finding that appellant forfeited argument by not supporting it with citations to the record).

¶ 38    Forfeiture aside, Taylor has not directed our attention to—and our own review of the record has not disclosed—any admissible evidence that, even when viewed in the light most favorable to Taylor, arguably shows that Saffold's unfavorable evaluation of Taylor's performance, either before or after the memorandum of understanding, involved deliberate lies about the job Taylor was doing as opposed to subjective disagreements about either Saffold's high expectations or whether Taylor had met them. Taylor's own belief that she satisfied the expectations set out in the memorandum of understanding does not, on its own, create a genuine dispute of material fact over Saffold's apparently contrary conclusion. See *Kreczo v. Triangle Package Machinery Co.*, 2016 IL App (1st) 151762, ¶ 31 (holding that plaintiff's affidavit "stating that he did a good job" did not create a triable issue of material fact over his job performance while in defendant's employ).

¶ 39    Third, Taylor has not put forward any admissible evidence showing that Saffold deliberately lied about the apparent financial malfeasance at Carver that was discovered around the time Taylor was fired. In her brief on appeal, Taylor asserts that "Saffold lied when she told Kirby that Taylor had violated CPS rules by paying her clerk too much money over the summer and [w]inter breaks of 2015 when in fact Taylor had not done so." Once again, she has forfeited this argument by not supporting that assertion with a citation to the record. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Je. A.*, 2019 IL App (1st) 190467, ¶ 57. Notwithstanding that, there simply is nothing in the record showing that Saffold lied to anybody about the situation. There is no evidence rebutting the proposition that Carver staff, including two office clerks, were paid out of a fund that was meant to support a nonexistent program. Taylor's averment in her own affidavit that she "did not engage in any financial malfeasance" does not refute Saffold's conclusion that the amounts expended were excessive. Taylor's belief that the amounts paid to Carver staff were "authorized and appropriate" was contrary to Saffold's, but that does not transform Saffold's

opinion into a false assertion of fact. While there may have been disputes about whether and when Saffold told Kirby that Taylor's "clerk made too much money" during breaks, there is no genuine dispute of material fact about whether that statement was a deliberate falsehood. Saffold's affidavit shows that it was not, and Taylor has not pointed to evidence arguably showing otherwise.

¶ 40    In sum, after Saffold carried her initial burden of showing that she was entitled to judgment as a matter of law on the merits of Taylor's tortious-interference claim, Taylor failed to meet her own burden of putting forward evidence arguably showing otherwise. The trial court, accordingly, properly granted summary judgment in favor of Saffold.[5]

¶ 41                              III.  CONCLUSION

¶ 42    For the foregoing reasons, we find that the trial court properly entered summary judgment against Taylor on both counts of her complaint. Accordingly, we affirm.

¶ 43    Affirmed.

---

[5]    As with the retaliatory-discharge claim, because summary judgment was proper on the merits, we do not need to consider whether Saffold was immune under the Tort Immunity Act.