NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240690-U

NO. 4-24-0690

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| BRUCE SMOLUCHA, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Livingston County |
| PSNERGY, LLC, a Limited Liability Company; PTC | ) | No. 18L31 |
| TUBULAR PRODUCTS, 2010, LLC, a Limited Liability | ) | |
| Company; and BLUCHIP INDUSTRIAL SERVICES, | ) | Honorable |
| INC., a Corporation, | ) | Jennifer H. Bauknecht, |
| Defendants | ) | Judge Presiding. |
| (PSNRGY, LLC, Defendant-Appellee). | | |

JUSTICE VANCIL delivered the judgment of the court.
Justices Zenoff and Grischow concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed the trial court's order striking the Illinois Supreme
Court Rule 191 (eff. Jan. 4, 2013) affidavit of the plaintiff's expert witness,
finding the witness's opinions were based on conjecture and speculation and
affirmed the award of summary judgment to defendant, finding defendant's duties
were limited to its contracts and voluntary undertakings and plaintiff had failed to
raise a genuine issue of material fact regarding the contents of those contracts and
undertakings and regarding defendant's contribution to plaintiff's injuries.

¶ 2   In early 2018, plaintiff, Bruce Smolucha, suffered carbon monoxide (CO)

poisoning while working at a factory owned by defendant, PTC Tubular Products, 2010, LLC, a

Limited Liability Company (PTC). He sued multiple companies, including defendant, PSNergy,

LLC, a Limited Liability Company (PSN), alleging PSN negligently serviced a certain furnace at

the factory, causing the furnace to emit dangerous concentrations of CO. PSN moved for summary

judgment, arguing it provided only limited "combustion tuning" services, not comprehensive

repair and maintenance for the furnace and it did not cause Smolucha's injuries. Smolucha offered an affidavit of John G. Green II, P.E., to provide expert opinion testimony on PSN's responsibilities and failures and on the cause of Smolucha's injuries. The trial court struck Green's affidavit, finding he was not qualified as an expert and his opinions were based on conjecture or speculation. It also granted summary judgment for PSN, finding PSN had no duty to repair, maintain, or service the furnace and Smolucha had not shown that CO from the combustion system caused his injuries.

¶ 3        Smolucha appeals, arguing the trial court erred by striking Green's affidavit and that genuine issues of material fact remain concerning PSN's duties, whether it breached those duties, and whether those breaches caused or contributed to his injuries. He asks us to reverse the court's order.

¶ 4        For the following reasons, we affirm the trial court's holding.

¶ 5                                    I. BACKGROUND

¶ 6        In early 2018, Smolucha was employed at PTC's factory located in Fairbury, Illinois, where it manufactures steel pipes for a variety of purposes. On four separate days, during his shifts, Smolucha began feeling ill. He sought medical treatment, and blood tests indicated he had suffered CO poisoning.

¶ 7        Smolucha's workstation was close to a "Roller Hearth Tube Annealing Furnace" (Subject Furnace). This Subject Furnace exposes the steel pipes to very high heat, in a process called "annealing." Oxygen inside the Subject Furnace can interfere with this process, so carbon rich gas is used to force oxygen out, and the remaining gas vents into the general atmosphere. The Subject Furnace's combustion system produces the high temperatures necessary to heat the pipes through a chemical reaction involving natural gas and oxygen, which produces explosions in tubes

inside the Subject Furnace. The gas that remains after this reaction, often including CO, moves into exhaust stacks, where it is diluted with air before being vented into the atmosphere. The Subject Furnace was not the only machine at PTC's Fairbury factory that used or produced CO.

¶ 8    In October 2018, Smolucha initiated this lawsuit against PSN and other defendants. In his third amended complaint, he alleged PSN's employees or agents worked on the Subject Furnace before January 27, 2018, and PSN's negligence caused his CO poisoning, resulting in brain damage. Specifically, Smolucha alleged PSN negligently failed to inspect the Subject Furnace, test for unsafe conditions, discover unsafe conditions, repair unsafe conditions, and warn the operator of the unsafe conditions and it otherwise breached its duty of care.

¶ 9    During a deposition, Smolucha testified that about a week before January 27, 2018, close to the end of his shift, he began feeling dizzy, lightheaded, and nauseous. After he went home, his symptoms faded. He went to work on January 26, but PTC sent the staff home because CO detectors were "going off all over the place." He had never seen CO detectors at work before. When he returned on January 27, he saw no CO detectors. About halfway through his shift, he started to feel ill, and his condition deteriorated. After his shift, he went to the emergency room (ER), where he was diagnosed with CO poisoning. On January 29, he felt ill again, and he returned to the ER. His final shift was on February 16, 2018, and he went to the ER again afterwards.

¶ 10    Smolucha was asked if he ever learned the source of the CO. He answered that he was told the Subject Furnace was the source, but he does not remember who told him this. Throughout this period, he did not see anything that led him to believe someone was working on the Subject Furnace. He did not know if PTC called in anyone to address the CO issue. He suspected not, because the problem persisted "for quite awhile." At the time, he was not familiar with PSN, and he did not know if PSN workers were at the factory during his shift.

¶ 11         The record includes PSN's invoices and service reports, which document its services to PTC. All the invoices listed "Combustion Efficiency Tuning," or some similar phrase, as the service provided. A January 30, 2018, invoice stated, "New quote as of Jan 24, 2018, Emergency Call work verified by B. Roof." The service reports detailed what work PSN completed on the visit. All the reports listed "Combustion Efficiency Tuning—Furnace #1," or some similar phrase, as the service performed. A January 26, 2018, service report included measurements of the concentrations of CO gas in each of the Subject Furnace's burners, before and after the tuning. Before tuning, most burners had 0ppm CO, but one had 150ppm, one 1500ppm, one 2000ppm, another 3000ppm, and finally, one measurement stated, "MAX." After tuning, the report stated each burner was emitting 0ppm CO.

¶ 12         The service report also documented conditions of the Subject Furnace and PSN's recommendations. For example, a December 2014 service report recommended that the Subject Furnace "be tuned bi-annually or at the very least annually." The report for the services provided on January 26, 2018, recommended repairing or replacing a certain butterfly valve, with a note that this had been recommended for two years. It also recommended that certain parts be removed at the next shutdown, cleaned, inspected, and repaired or replaced if necessary. The report stated, "The CO levels in the plant being high can be attributed mainly to lack of/poor ventilation." It noted that 4 of the 28 tubes in the Subject Furnace's combustion system had high CO readings, but this "would have contributed only slightly to the plant CO issue." It further noted that the "exhaust stacks" had no "exhaust hoods," nor did a "furnace/cooling exit," so "[t]he atmosphere coming out of this exit is rich in CO and is just dissipating into the plant."

¶ 13         Orders for PSN's services from PTC's records are also part of the record. One states, "Date Ordered: 01/03/2018." The description provided is "tuning of all burners on the

annealing furnace." The due date listed is January 29, 2018. At the bottom is a handwritten signature and date, with a date of "1/3/17 [*sic*]." Another, otherwise identical, work order adds, "Price is changed due to Emergency call[.] New quote as of Jan 24 /20018 [*sic*]," and the price has increased. The handwritten date at the bottom is January 25, 2018.

¶ 14        Two PSN employees were deposed. Christopher Wyant, vice president of technology for PSN, testified PSN began providing combustion tuning services on the Subject Furnace in December 2014. Wyant explained that for the Subject Furnace, "the air-to-fuel ratio is extremely critical to get proper combustion or optimal combustion." Over time, he continued, the Subject Furnace degrades because of, for example, the accumulation of dirt, rust, or carbon deposits, and these degradations can affect the air-to-fuel ratio. This is not a result of negligence, he added, but it is natural and expected. If the proportion of air is too high, "it becomes inefficient." If the system is "rich" in gas, then there is not enough oxygen in the system for full combustion, which can result in CO, smoke, soot, or even fire. If the air-to-fuel ratio is even slightly off, there will be "excess CO." He stated that, ideally, the air-to-fuel ratio is 11.5 to 1, and this results in "excess oxygen" production of 3%, the industry standard. Wyant explained that regular combustion tuning ameliorates this degradation. Before tuning, PSN technicians put a probe in the "exhaust *** stack" to measure various levels in the Subject Furnace, including CO. The technician then adjusts the amounts of air and gas to reach the proper ratio. PSN ensures that the CO concentration in the tube is no greater than 500ppm after tuning.

¶ 15        Wyant explained that PTC and PSN did not sign any contracts except for purchase orders. To his understanding, "the extent of [PSN's] services [to PTC] are to provide combustion tuning." He testified they are not hired to perform "any sort of repair or maintenance to the furnace or the combustion system." But he acknowledged, in PSN's reports, they recommended

maintenance on the combustion system. PSN probably never told PTC in writing that tuning should take place every six months, although Wyant was not sure. PSN's service reports are e-mailed to the customer within two weeks of the service call. Wyant confirmed that PSN had not trained PTC's staff on how to set the air-to-fuel ratio or fix excess CO production without needing PSN's assistance. PSN offered training, including a manual describing how the Subject Furnace is tuned. Wyant was familiar with PTC's Fairbury factory and knew that other machinery there used or produced CO. He agreed that CO is a safety hazard "[a]t certain levels."

¶ 16 Wyant testified he was present at prior service calls to PTC but not on January 26, 2018. He acknowledged that as early as December 2014, the Subject Furnace produced "excess" CO. When he last visited PTC, he did not record or report his measurements to PTC because PTC had not requested those numbers, and PSN generally did not make a record unless asked to do so. However, Wyant testified they had never encountered a situation where CO was at a "dangerous level," but the customer told them not to report it. Wyant was asked if anyone at PSN ever told PTC that the Subject Furnace was producing unsafe levels of CO. He answered, "There have been no unsafe levels of carbon dioxide [*sic*] around this furnace." He explained that the "excess carbon" he referred to was "in the stack of the furnace, not outside." Inside the Subject Furnace, 500ppm "is allowable," but even higher concentrations inside the Subject Furnace do not result in unsafe concentrations outside it. PSN staff wear CO monitors when they work on the Subject Furnace. He accepted that the PTC factory had an unsafe concentration of CO in the atmosphere, but he insisted it did not come from the Subject Furnace's combustion system. In recommending to customers how often to tune a furnace, he considered the cost of the services and the efficiency of the furnace. CO emissions do not affect the determination, because even if the Furnace is not running well, it will result in lower CO concentrations than a car sitting in traffic. Concerning the

report for the January 26 visit, Wyant testified that any CO coming from the combustion system was normal. Especially six months after the previous tuning, some of the tubes would produce over 10,000ppm CO, but this would not result in CO "issues around the furnace."

¶ 17        Brian Stallard was also deposed. He performed the service call to PTC on January 26, 2018. He explained that in the "suggestions/recommendations" section of PSN's service reports, whoever worked on the Subject Furnace would make notes if they observed parts in need of repairs, but PSN did not handle these repairs. The service report, including the recommendations, were eventually given to the customer "in a number of weeks." PSN did not verify if the client follows up on their recommendations.

¶ 18        Stallard testified that in January 2018, he was in the early parts of completing the "learning phase" of his employment. He explained that the purpose of the January 26 service call was "to verify the condition of the furnace and, kind of, make a determination of if that was where their main—their CO problem was coming from." PTC called PSN for both their "semiannual tuning" and to "investigate the [CO] problems the plant was having." This was the only call Stallard knew about where PSN "specifically address[ed] CO." PSN normally did not work on "atmosphere generators," but on this call, because this equipment "[made] an atmosphere that's rich in CO," they looked at PTC's atmosphere generator. Stallard was asked why the service call report did not list "[CO] inspection" in either the services performed or service call description. He answered that he did not know why, but "[i]t should have been—it was kind of an emergency call, but not really, because it was close to being scheduled anyway, but it was different than your basic tuning." But he also said that looking for CO problems was a "favor" for PTC. He later admitted that he did not know what specifically PTC requested and he did not schedule the service call, but he was told to see if the Subject Furnace was contributing to the CO problem.

¶ 19        Stallard did not know when PTC first contacted PSN regarding the CO problems. He testified PSN classified a call as an "emergency" if the customer said it had a "major problem" and it needed PSN the next day instead of in a month. The January 26 call was classified as an emergency because the date was moved forward. Smolucha's counsel asked, "So PTC first reached out about this [CO] issue on January 3rd, 2018, true?" Stallard answered, "Yes." Later, Stallard testified he did not know when PTC asked PSN to move up the appointment, but looking at the purchase order, he believed that on January 3, the visit was scheduled for January 29, and then on January 24, PTC asked PSN to come earlier, so PSN classified the visit as an "emergency" and came on January 26.

¶ 20        Reviewing the January 26 service call, Stallard explained that his recommendations mostly related to the combustion tuning, but a few of the issues could have contributed a small amount to the CO problems in the factory. He did not recommend that the Subject Furnace be shut down until the problems were addressed. He explained, "Shutdowns are avoided at all costs." He agreed that PSN had not made many of these recommendations until the January 26 visit but that was because they had never addressed a CO problem until this call. They only addressed the air-to-gas ratio. He confirmed that he authored the report, which would have been reviewed by Wyant and then sent to PTC. He also testified that PSN was "beholden" to PTC on how often they perform tunings and PSN cannot help it if the client does not follow through with PSN's recommendations.

¶ 21        PSN moved for summary judgment. It argued that its responsibilities were limited to tuning the Subject Furnace and Smolucha produced no evidence it acted negligently in providing tuning services. It further argued that some CO emission was an expected and safe byproduct of the combustion process and the emissions from the Subject Furnace were within the safe and

normal range. Therefore, PSN claimed, Smolucha had not shown that CO emissions from the Subject Furnace caused his injuries.

¶ 22     In opposition to PSN's motion, Smolucha submitted an affidavit from John G. Green II, P.E. Green testified he was a mechanical engineering expert. He was a licensed professional engineer in 25 states, including Illinois. His *curriculum vitae* was attached to the affidavit, further detailing his engineering credentials. Green indicated that he personally visited PTC's factory and inspected the Subject Furnace and he based his opinions on that visit, the depositions, and other discovery documents produced during this court case.

¶ 23     Green opined that PSN's carelessness caused CO accumulation in the PTC factory. He asserted that PSN was obligated to "act as a reasonable combustion tuning company," including properly repairing, maintaining, testing, and inspecting the Subject Furnace, as well as discovering any unsafe conditions and warning Smolucha or his employer. He stated that PSN carelessly failed to fulfill these obligations, and he listed specific failures. For example, Green explained: Wyant knew the Subject Furnace was producing "excess [CO]," but he never reported any CO measurements to PTC; Wyant failed to recommend in writing that PTC's Subject Furnace be tuned every six months; PSN sent Stallard, instead of Wyant, to the January 2018 service call, even though Stallard was in the "learning phase" of his employment; and PSN never confirmed that PTC could tune the Subject Furnace without PSN's services. Green further stated, "Despite the fact that PTC called PSN to address [CO] accumulation problems on January 3, 2018, PSN did not arrive to the PTC factory until January 26, 2018." He also asserted that Smolucha suffered CO poisoning on January 27, the day after PSN left PTC's factory, "indicating that PSN did not properly and adequately tune the Subject Furnace to eliminate the production of excess [CO], nor did it address any of the ventilation issues it described in its service report." Green concluded that

PSN's negligent acts or omissions caused CO accumulation in the PTC factory, resulting in Smolucha's injuries.

¶ 24 PSN moved to strike Green's affidavit, and the trial court granted the motion. It found that Green was not qualified to opine on combustion tuning or the standard of care for a reasonably careful combustion technician because he had no education, experience, or training on these matters and, although he visited the Subject Furnace, he did not identify anything he learned from his inspections. The court further found Green's opinions were conclusory, speculative, or misstated the evidence because, for example, he failed to identify what, if anything, he learned from viewing the Subject Furnace, failed to refute or completely ignored testimony concerning industry standards, failed to state what the standards for a reasonable combustion tuning were, in his opinion, and misused keys terms from the record, such as "excessive amounts of carbon" or "combustion tuning."

¶ 25 The trial court also granted PSN's motion for summary judgment. It found PSN "was hired to complete combustion tuning services" and "its duty was to perform those combustion tuning services with reasonable care." The court reasoned that all the evidence indicated PSN acted within the standard of care. Although Smolucha argued PSN had additional duties, the court determined that the existence and scope of PSN's duties was a question of law and that PSN's duties did not include "maintenance, repair, and/or service of the Subject Furnace or its ventilation system." Finally, the court concluded, "[I]t is unrefuted that the emission of combustion byproducts, including CO, from the exhaust stacks of the Subject Furnace were within industry standards, expected and a safe result of the combustion process. [Smolucha] has failed to show that the CO byproduct from the combustion process caused [his] injuries."

¶ 26 Smolucha filed a motion to reconsider, as well as a motion asking the trial court to take judicial notice of certain CO standards promulgated by the National Fire Protection Association (NFPA). These standards list risks of CO exposure based on the concentration of CO and duration of exposure. For example, two to three hours of exposure to 200ppm can cause mild headaches, and one to three minutes of exposure to 12,800ppm can cause unconsciousness and risk of death. The court granted the motion for judicial notice, but it denied the motion to reconsider.

¶ 27 This appeal followed.

¶ 28 II. ANALYSIS

¶ 29 Smolucha asks us to reverse the trial court's order striking Green's affidavit and granting summary judgment and to remand for further proceedings. PSN asks us to affirm.

¶ 30 A. Green's Affidavit

¶ 31 We begin with the trial court's decision to strike Green's affidavit. The court found Green did not qualify as an expert and that his testimony was based, not on facts, but on speculation and conjecture. Smolucha asks us to reverse this order, or at least to strike only the offending portions instead of the entire affidavit.

¶ 32 Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) governs the admissibility of affidavits in support of a motion for summary judgment. This rule "provides that an affidavit must be (i) made on the affiant's personal knowledge, (ii) not consist of conclusions but facts admissible in evidence, and (iii) affirmatively show that the affiant could testify competently about those facts." *Kreczko v. Triangle Package Machinery Co.*, 2016 IL App (1st) 151762, ¶ 18. "[T]he rule is satisfied if from the document as a whole it appears that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently

testify to its contents at trial." *Burks Drywall, Inc. v. Washington Bank & Trust Co.*, 110 Ill. App. 3d 569, 576 (1982). Strict compliance with Rule 191(a) is necessary, and "[a]ffidavits in opposition to motions for summary judgment must consist of facts admissible in evidence as opposed to conclusions, and conclusory matters may not be considered in opposition to motions for summary judgment." *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 21. The court should strike only the improper portions of a Rule 191(a) affidavit. *Roe v. Jewish Children's Bureau of Chicago*, 339 Ill. App. 3d 119, 128 (2003). We review a motion to strike affidavits in conjunction with an order granting summary judgment *de novo*. *Jackson v. Graham*, 323 Ill. App. 3d 766, 773-74 (2001); see *Bailey v. Graham Enterprises, Inc.*, 2019 IL App (1st) 181316, ¶ 21; see also *Collins v. St. Paul Mercury Insurance Co.*, 381 Ill. App. 3d 41, 46 (2008); *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶¶ 54-56; but *cf. McDonald v. Lipov*, 2014 IL App (2d) 130401, ¶ 34 (reviewing for abuse of discretion).

¶ 33       Smolucha offered Green's affidavit to provide expert opinion testimony. Courts apply a "more stringent" standard for admission of an expert's Rule 191 affidavit than we would apply for expert testimony at trial, "in that Rule 191 requires the expert to disclose the specific facts (or personal knowledge) supporting his or her opinion in an affidavit, whereas, at trial, the expert may give an opinion without disclosing the facts underlying that opinion." *Brettman*, 2020 IL App (2d) 190955, ¶ 4 (citing *Robidoux v. Oliphant*, 201 Ill. 2d 324, 334-35, 338 (2002)). "An expert's opinion is only as valid as the reasons for the opinion." *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 400 (2007). "Expert opinions relying on speculation, conjecture, or guess as to what the witness believed might have happened are inadmissible." *Berke*, 2016 IL App (1st) 150397, ¶ 21. "When experts (i) fail to take into consideration a party's actions, (ii) base their opinions on facts not in evidence, (iii) base their opinions on what might have happened, and

(iv) ignore significant factors, the court will reject the experts' opinions as mere speculation and conjecture." *Id.*

¶ 34 We agree with the trial court's conclusion that Green's opinions were conclusory, speculative, and relied on facts not in evidence. Although Green stated, generally, that his opinions were based on the record, his own background, and his personal knowledge of the case, including his own visit to the Subject Furnace, he provided no explanation of how each of these informed his opinion. For example, he opines:

> "That each and every time PSN was onsite to perform maintenance and inspect the Subject Furnace, PSN was required to act as a reasonable combustion tuning company that would include properly and adequately repairing, maintaining, testing, and inspecting the Subject Furnace, as well as properly and adequately discovering and warning the Plaintiff and/or his employer of the unsafe and dangerous condition of the Subject Furnace and its inadequate venting."

Green provides no basis for his opinion that the standard of care for reasonable combustion tuning includes all these responsibilities. He did not base this opinion on anything in the record, because the only evidence of the standard of care came from Wyant and Stallard, who indicated that their combustion tuning responsibilities did not include general inspections, repairs, and maintenance of Subject Furnace. But Green provided no other facts from outside the record to support his conclusion.

¶ 35 Moreover, in listing the ways he believed PSN failed in its responsibilities, Green relies on the record to support propositions that the evidence does not support. For example, Green opines PSN failed in its responsibilities because both Wyant and Stallard testified the combustion system was producing "excess [CO]." Green declines to note that, as both Wyant and Stallard used

this phrase, "excess" CO simply referred to inefficient concentrations of CO. Both Wyant and Stallard clearly testified that this "excess" was an expected, unavoidable part of the combustion tuning process, not a result of PSN's conduct. Similarly, he claims PSN was negligent in failing to respond more quickly to PTC's request for services on January 3, 2018. As we explain below, the record does not support this view. If Green's conclusions about PSN's responsibilities on these matters depend on facts outside the record, he failed to provide those facts.

¶ 36          Additionally, Green states, "After PSN left the premises on January 26, 2018, the Plaintiff suffered another [CO] poisoning the next day, indicating that PSN did not properly and adequately tune the Subject Furnace to eliminate the production of excess [CO]." This is speculation. The only available evidence indicates that when Stallard left the factory after his January 26 visit, the Subject Furnace's combustion system was emitting no CO. The mere fact that Smolucha suffered an injury the following day does not prove PSN acted incompetently, particularly when other machinery in the factory used or produced CO. Once again, if Green knew facts not in the record that convinced him the combustion system was still emitting CO, despite the evidence suggesting otherwise, he failed to provide those facts in his affidavit.

¶ 37          Smolucha relies on *Brettman*. There, the plaintiff alleged the defendants negligently placed temporary traffic control lights, leading to an automobile crash. *Brettman*, 2020 IL App (2d) 190955, ¶ 10. The defendants moved for summary judgment, and the plaintiff submitted a Rule 191(a) affidavit from an expert, who testified that the improper placement of the temporary lights contributed to the crash. *Id.* ¶¶ 27, 34-40. The trial court struck the expert's affidavit, finding that he had provided opinions but not facts, and granted summary judgment for the defendants. *Id.* ¶ 3. The plaintiff appealed, and the appellate court reversed. The court found that the expert had based his opinion on specific facts and his personal knowledge, so his opinion was admissible. *Id.*

¶ 4. Smolucha claims that Green's affidavit here is comparable to the expert's affidavit in *Brettman*.

¶ 38    We find *Brettman* distinguishable. Indeed, the affidavit in *Brettman* provided just the sort of specific facts or personal knowledge that was lacking here. The *Brettman* affidavit included a 17-page report detailing the factual bases for the expert's conclusion. For example, he "opined that the road curvature impeded visibility, and he attached a picture of the curve." *Id.* ¶ 78. He provided detailed calculations showing precisely how long the driver had to respond to warning signs, and the calculations were supported by witness testimony. *Id.* ¶ 79. When explaining his conclusions, he cited and quoted relevant scientific authority, including research on "inattentional blindness." *Id.*

¶ 39    Here, Green provided no such facts to support his opinion. Although he baldly asserted an opinion on the standard of care for a reasonable combustion tuner, he provided no research, no details of his personal experience, nor any specific reference to his training to specify his basis for asserting this opinion. Likewise, if something in his own background or personal knowledge led him disagree with Wyant and Stallard on the acceptable minimal presence of CO in combustion tuning, he failed to specify what that would be.

¶ 40    Smolucha is correct, however, that only the offending portions of Green's affidavit should be struck. The offending portion includes any portion of the affidavit in which Green opines on the standard of care of a reasonably responsible combustion tuner and on PSN's failure to satisfy that standard. We therefore strike all of paragraphs 11, 16, 17, 18, and 19. The remaining portions of the affidavit do not affect our summary judgment analysis, so we need not consider whether Green was properly qualified as an expert.

¶ 41                    B. Summary Judgment

¶ 42          We now consider the award of summary judgment. Summary judgment is proper when the pleadings, depositions, admissions on file, and affidavits, if any, establish that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). "All facts should be construed in favor of the nonmovant, and 'where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact,' summary judgment should not be granted." *Biancorosso v. Troy Community. Consolidated School District No. 30C*, 2019 IL App (3d) 180613, ¶ 12 (quoting *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995)). "Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law." *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010). Our review is *de novo*. *Id.*

¶ 43          "To state a cause of action for negligence, the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach." *Espinoza*, 165 Ill. 2d at 114. Whether a duty exists is a question of law, but breach and causation "are factual matters for a jury to decide, provided there is a genuine issue of material fact regarding those issues." *Id.*

¶ 44                                          1. *Duty*

¶ 45          We begin with PSN's duties. Smolucha contends that PSN had duties to him based on its contracts with PTC, its voluntary undertakings, and the common law. PSN acknowledges some minimal duty to provide combustion tuning services but disputes the scope of that duty.

¶ 46                                          a. Contract

¶ 47        First, Smolucha argues PSN's contracts with PTC created a duty. Although PSN and PTC did not have a standing contractual relationship, PSN regularly contracted with PTC to service the Subject Furnace. Smolucha claims these agreements created a professional duty to exercise reasonable care in responding promptly, investigating, and correcting dangerous conditions. He especially emphasizes the fact that PSN did not tune the Subject Furnace until January 26, 2018, despite PTC's request for emergency services. He further contends, citing Illinois Pattern Jury Instructions, Civil, No. 105.01 (revised April 2020), that the applicable professional standards are a factual issue which must be established by expert testimony, so summary judgment is inappropriate. See *id.* ("The law does not say how a reasonably careful [professional] would act under the circumstances. That is for you to decide."); see also *Advincula v. United Blood Services*, 176 Ill. 2d 1, 24 (1996).

¶ 48        PSN acknowledges it had a duty to provide combustion tuning services. However, PSN contends that, as a matter of law, this duty did not include comprehensive repairs or maintenance on the Subject Furnace. Citing *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 525 (2001), it argues that in a negligence action based on contract, "the scope of duty is determined by the terms of the contract." PSN acknowledges that "industry standards are generally admissible to help establish the requisite standard of care." See *Murphy v. Messerschmidt*, 41 Ill. App. 3d 659, 661 (1976). Nevertheless, PSN claims it did not contract to perform the repair and maintenance services that Smolucha relies on, so it had no duty to perform them. PSN further claims the testimony does not establish that it failed in its duty to respond in a timely fashion to PTC's request for services.

¶ 49        We agree with PSN. "An allegation of negligence based upon a contractual obligation, although sounding in tort rather than contract, is nonetheless defined by the contract."

*Eichengreen*, 325 Ill. App. 3d at 525. Therefore, the contract defines the scope of the duty. *Id.* "Whether a contract exists, its terms, and the intent of the parties are *questions of fact* for the trier of fact." (Emphasis in original.) *Mulliken v. Lewis*, 245 Ill. App. 3d 512, 516 (1993). However, when no factual dispute exists and reasonable people would agree as to the inferences drawn from them, this question becomes a question of law. *Commonwealth Edison Co. v. Industrial Comm'n*, 167 Ill. App. 3d 229, 233 (1988).

¶ 50 Beginning with PSN's services prior to 2018, Smolucha has not produced any evidence that remotely suggests PSN contracted to provide the sort of holistic inspections, repairs, and maintenance on the Subject Furnace that he relies on. Wyant testified that PSN and PTC had no written agreement other than purchase orders. He also testified PSN's services to PTC were limited to "combustion tuning" and they did not include repairs or maintenance. Stallard testified the January 2018 service call was the first call concerning CO in the atmosphere. The purchase orders, service reports, and invoices from before January 2018 describe the contracted-for services as "Combustion Efficiency Tuning." Smolucha has introduced no evidence that these contracts created any duty for PSN other than providing combustion tuning services.

¶ 51 Smolucha focuses especially on PSN's agreement to provide services in January 2018, so we consider this agreement separately. Smolucha claims that in January 2018, PSN agreed to "address" PTC's "[CO] problem" and thereby accepted a duty to exercise reasonable care "in providing timely services to investigate and correct a dangerous condition and to prevent the risk of harm to Smolucha or any other PTC employees."

¶ 52 We see no basis in the record to conclude that PSN agreed to "correct" PTC's CO problems. Nor do we see any evidence PSN agreed to protect PTC's employees from any risks of CO. However, Stallard acknowledged that PSN's January 26, 2018, services were "different than

- 18 -

your basic tuning." He testified that the purpose of this particular service call "was to verify the condition of the furnace and, kind of, make a determination of if that was where their main—their CO problem was coming from." When asked why PSN's documentation of the visit did not list "[CO] inspection" as a service provided, he answered that he did not know, but it should have. Construing the record in Smolucha's favor, Stallard's testimony could indicate PSN agreed, in January 2018, to inspect the Subject Furnace for potential contributions to the factory's CO problems, a service it had not provided before, although this still does not establish that PSN contracted to remedy PTC's CO problems or comprehensively repair the Subject Furnace.

¶ 53　　　　　Furthermore, Smolucha's incorrect assertion that PSN agreed to provide "emergency" services on January 3, 2018, does not raise a *bona fide* factual dispute. See *Morrissey*, 404 Ill. App. 3d at 724. During Stallard's deposition, Smolucha's attorney asked, "So PTC first reached out about this [CO] issue on January 3rd, 2018, true?" Stallard answers, "Yes." Based on this response, Smolucha claims PSN knew PTC needed emergency services on January 3 but did nothing for three weeks.

¶ 54　　　　　But Stallard's other comments throughout the deposition clarify that this is not what happened. He first testified he did not know when PTC first contacted PSN about the CO problem. He explained that PSN labels a call an "emergency" whenever a client asks to move up the date of a previously scheduled appointment. After viewing a purchase order for the visit, he indicated that, on January 24, 2018, PTC asked PSN to move up the date of the visit. The record contains two PTC purchase orders for the January 26 visit. The first, dated January 3, listed a due date of January 29, and it said nothing about any emergency. Instead, the first reference to any "emergency" appeared on an edited purchase order, which stated a new quote was offered on January 24. The record also contains a PSN invoice, dated January 30, 2018, which stated, "New quote as of Jan

24, 2018, Emergency Call work verified by B. Roof." Considering Stallard's deposition as a whole, his testimony does not raise a genuine issue of material fact regarding when PSN agreed to come to PTC's facility. See *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶¶ 39-41 (reading the defendant's deposition "as a whole," and rejecting the plaintiff's attempt to create a genuine issue of material fact through "evidentiary cherry-picking"). Instead, the evidence, even construed in Smolucha's favor, could show that PSN agreed only on January 24, 2018, to provide "emergency" services and that it provided such services two days later.

¶ 55      To summarize, we find Smolucha has provided enough evidence to support a finding that PSN contracted to perform combustion tuning services, provide expedited services as of January 24, 2018, and, perhaps, inspect the Subject Furnace on January 26, 2018. However, he has raised no genuine issue of material fact on the standard of care for such professional services. To the extent that expert testimony is necessary to establish a standard of care, because we have struck the portions of Green's affidavit concerning the standard of care as speculative and without sufficient factual basis, Smolucha has produced no evidence to contest the deposition testimony of Wyant and Stallard regarding what constitutes reasonable services.

¶ 56                          b. Voluntary Undertaking

¶ 57      Second, Smolucha claims PSN voluntarily undertook a duty to him. According to the Restatement (Second) of Torts § 324A (1965):

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking;"

See *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 217-18 (1988); see also *Bourgonje v. Machey*, 362 Ill. App. 3d 984, 996 (2005). Liability based on a voluntary undertaking can result from "misfeasance," meaning, "the negligent performance of the undertaking," or from "nonfeasance," meaning "failure by omission to perform the voluntary undertaking." *Bourgonje*, 362 Ill. App. 3d at 996.

¶ 58        Smolucha contends PSN undertook a relationship with PTC to provide specialized services and then negligently performed those services. He argues PSN is liable for misfeasance because it, for example, failed to inform PTC in writing that tuning should occur every six months, failed to provide CO measurements to PTC unless explicitly asked to do so, required PTC to purchase a training manual to understand how its Subject Furnace worked, sent a technician who had only recently completed the "learning phrase" of his employment, failed to notify PTC of inadequate venting before January 2018, and failed to recommend the Subject Furnace be shut down until such venting was installed.

¶ 59        Smolucha further claims PSN committed nonfeasance after prompting PTC to rely on PSN to address its CO problems, resulting in PTC forgoing other potential arrangements or precautions. He relies on Illustration 4 from the Restatement, which states:

"A Company employs B Company to inspect the elevator in its office building. B Company sends a workman, who makes a negligent inspection and reports that the elevator is in good condition. Due to defects in the elevator, which a proper

- 21 -

inspection would have disclosed, the elevator falls and injuries [*sic*] C, a workman employed by A Company. B Company is subject to liability to C." Restatement (Second) Torts § 324A, Illustration 4 (1965).

Smolucha contends that PSN negligently inspected the Subject Furnace by arriving three weeks after PTC scheduled services and that, after Stallard found problems with the Subject Furnace that could have contributed to the CO problem in the factory, he did not alleviate the problems or warn PTC about the dangers to its employees. Smolucha contends PSN acted just like Company B in the illustration, so it is liable for nonfeasance.

¶ 60        Just as we found regarding PSN's contractual duties, we find there is enough evidence, when it is construed in Smolucha's favor, to permit the conclusion that PSN had certain limited duties. "The duty of care imposed upon a defendant under a voluntary undertaking theory of liability is limited to the extent of the undertaking." *Elam v. O'Connor & Nakos, Ltd.*, 2019 IL App (1st) 181123, ¶ 41. "This theory is narrowly construed." *Id.* Prior to January 26, 2018, PSN agreed only to perform tuning services. There is no evidence this included all the other obligations Smolucha seeks to impose. For example, PSN did not undertake to inspect PTC's vents, at least not before January 2018. Likewise, PSN did not volunteer to provide CO measurements beyond what PTC requested. The record simply does not support a finding that PSN undertook a duty to repair and maintain the Subject Furnace or, prior to January 26, even to inspect it.

¶ 61        Smolucha's citation to Illustration 4 is misplaced. Unlike in the illustration, before January 2018, PTC did not hire PSN to inspect the Subject Furnace, but only to perform combustion tuning. This limited undertaking did not include general safety inspections of the entire Subject Furnace. Perhaps PSN agreed to conduct a more general inspection in January 2018. If so, there is no evidence that either PTC or Smolucha relied on any assurance from PSN that the Subject

Furnace had no defects or that they rejected other possible remedies. See *Bourgonje*, 362 Ill. App. 3d at 997 ("Under Illinois law, a plaintiff's reliance on the defendant's promise is an independent, essential element in cases of nonfeasance."). For example, there is no evidence that Stallard assured PTC on January 26, 2018, that the Subject Furnace was not contributing CO to the atmosphere. Instead, Stallard recommended maintenance or repairs that could have helped ameliorate the CO problems. Nor is there evidence that PTC declined some other inspection that would have disclosed problems that PSN failed to disclose. Furthermore, in Smolucha's deposition, he testified he did not know about PSN at the time of his injuries. See Restatement (Second) Torts § 324A, Illustration 4 (1965). Indeed, at the time of his injury, he suspected that PTC had not hired anyone to address the CO problems at the factory. Without any evidence of reliance, Smolucha cannot show "nonfeasance."

¶ 62　　　　Ultimately, we find PSN's duties based on voluntary undertaking were the same as those based on contract: to perform combustion tuning services, provide expedited services as of January 24, 2018, perhaps inspect the Furnace on January 26, 2018, and act in a professional manner in providing these services.

¶ 63　　　　　　　　　　　　　c. Common Law

¶ 64　　　　Finally, Smolucha contends PSN owed him a common law duty of reasonable care.

"It is well settled that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Widlowski v. Durkee Foods, Division of SCM Corp.*, 138 Ill. 2d 369, 373 (1990).

"This does not establish a 'duty to the world at large.'" *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 19. Instead, "[a] legal duty refers to a relationship between the defendant and the plaintiff such that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22. In determining whether a defendant owed a plaintiff a duty of care, we consider the following four factors: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Quiroz v. Chicago Transit Authority*, 2022 IL 127603, ¶ 13.

¶ 65        Smolucha claims the four factors support finding a duty here. He argues that (1) PSN's failure to promptly respond to PTC's CO issues created a foreseeable risk of injury, (2) an injury was likely after PSN delayed responding, (3) it would not have been burdensome for PSN to respond more quickly, and (4) the burden of expecting PSN to solve PTC's CO problems was low, because they were hired to do just that. Citing *Melchers v. Total Electric Construction*, 311 Ill. App. 3d 224, 228 (1999), Smolucha contends that contractors have a duty to protect others from injury and that the same analysis applies here. He argues that PSN owed him a duty "to protect him from the dangers of [CO] poisoning."

¶ 66        PSN disagrees. It contends no injury was foreseeable or likely because the undisputed evidence indicates CO exhaust from the combustion system could not cause any injury and the combustion system exhausts CO in safe concentrations by design. It further contends that the costs of placing the burden of guarding against any potential CO poisoning on PSN, rather than PTC, is high, because PTC owns the facility and the Subject Furnace.

¶ 67        Once again, we agree with PSN. "Generally, individuals (and businesses) do not owe an affirmative duty to protect or rescue a stranger." *Simpkins*, 2012 IL 110662, ¶ 19.

- 24 -

Smolucha's discussion of the four factors does not convince us to find otherwise here. Admittedly, with the Subject Furnace emitting CO gas by design and possessing some of the problems Stallard recognized in the service report, it is at least somewhat foreseeable that an employee could suffer CO poisoning from the insufficient inspection, maintenance, or repair of the Subject Furnace. See *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 442 (2006) ("As one court has observed, 'what is required to be foreseeable is the general character of the event or harm *** not its precise nature or manner of occurrence.' " (quoting *Bigbee v. Pacific Telephone & Telegraph Co.*, 34 Cal. 3d 49, 57-58 (1983)). We also agree with Smolucha that there was at least a reasonable likelihood of an injury. Wyant and Stallard both knew that CO could be a dangerous gas. PSN staff had been informed, at least by the time Stallard arrived at PTC's factory, that PTC was having CO problems. PSN staff knew that the Subject Furnace emitted at least low levels of CO, by design. It also knew about various imperfections in the Subject Furnace, such as the suboptimal vents. Considering all of this, it was reasonably likely that an employee of PTC could suffer a CO-related injury.

¶ 68      However, we find the last two factors strongly persuade us not to impose an additional duty on PSN. In claiming that PSN had a duty to "protect him from the dangers of [CO] poisoning," Smolucha asks us to find PSN was obligated to correct any possible CO-related defect in its client's factory and to respond to any request for services immediately, or at least more quickly than it did. If we found PSN had such a duty, every contract for combustion tuning would entail added duties to inspect, maintain, and repair the client's machinery. Such a burden would dramatically increase PSN's responsibilities, not only each time it arrived at a client's facility, but each time any client requested services.

¶ 69      Moreover, the consequences of placing that burden on PSN would be extreme. PSN does not own the factory or the Subject Furnace. PSN sends technicians to PTC's factory only

about twice per year to perform a specific task. For PSN to ensure that PTC's factory and equipment were constantly maintained and repaired, PSN would need much greater access to PTC's facility, perhaps even to take control of that factory and equipment. Smolucha's only basis for imposing such responsibilities on PSN is PSN's agreements with PTC. But those agreements are for specific, limited services, and they do not provide a basis for a separate, comprehensive duty to protect PTC's employees from harm. To find otherwise would completely eliminate the well-established principle that businesses do not owe an affirmative duty to protect strangers. *Simpkins*, 2012 IL 110662, ¶ 19.

¶ 70     We do not find Smolucha's citation to *Melchers* compelling. There, Riverside Construction Company (Riverside) was hired to excavate at a construction site, and the plaintiff worked as an electrician for another subcontractor assisting with the construction. *Melchers*, 311 Ill. App. 3d at 226. Riverside's employees dug a trench, and they used wood planks and wheelbarrows to move dirt away from the site. *Id.* They then left the site and the equipment to employees of other companies to use. *Id.* at 230. Another worker at the site was moving a wheelbarrow when he lost control of it. The wheelbarrow and the clay inside it fell off the plank and struck the plaintiff. *Id.* at 227. The plaintiff sued, and the defendant filed a third-party complaint against Riverside for negligence. Riverside moved for summary judgment, arguing it had no duty to supervise employees of other subcontractors, and the trial court agreed. *Id.*

¶ 71     The appellate court agreed that Riverside's contract did not require it to supervise the employees of other subcontractors. *Id.* at 228. However, the court found Riverside had a common law duty to perform its work with reasonable care. *Id.* The court found it foreseeable that employees of other companies would use Riverside's equipment and the likelihood of an injury to workers in the trench was great. It also found that the magnitude of the burden and consequences

of placing it on Riverside were minimal because Riverside could have required that only skilled workers use the wheelbarrow or that the wheelbarrow not be used while workers were in the trench. *Id.* at 230. The court concluded that Riverside "had a duty to exercise reasonable care to protect plaintiff from injury caused by its equipment or apparatus." *Id.*

¶ 72        *Melchers*'s reasoning does not apply here. First, Smolucha does not ask us to find that PSN had a duty to protect him "from injury caused by its equipment or apparatus." *Id.* Instead, he asks us to find that PSN had a duty to protect him from injury caused by PTC's equipment or apparatus. We decline to extend *Melchers*'s holding so dramatically. The burden of Smolucha's proposed duty on PSN would be much more than simply waiting to use a wheelbarrow until another worker moves. Instead, he expects PSN to assume responsibility for the safety of another company's factory. *Melchers* involved no such burden, and we are not persuaded to find that PSN had such a duty here.

¶ 73                              d. Scope of Duty

¶ 74        In response to PSN's claim that its duties were strictly limited, Smolucha generally responds that once the existence of a duty is established, whether the defendant's specific acts or omissions breached that duty is a question for a jury and summary judgment is inappropriate. He argues the trial court improperly conflated duty with breach, and he urges us not to repeat the mistake.

¶ 75        Smolucha primarily relies on *Marshall*. There, the trial court dismissed the plaintiff's negligence claim, finding the defendant fast food restaurant did not have a duty to protect its customers from a car crashing through the restaurant wall. *Marshall*, 222 Ill. 2d at 427. The supreme court reversed. It reasoned that the "the special relationship between a business invitor and invitee does indeed give rise to a duty of reasonable care," including a duty to protect

the invitee from the negligent acts of a third party. *Id.* at 437, 441. The four factors typically used to determine the existence of a common law duty did not create an exception to this rule for the dangers posed by "out-of-control drivers." *Id.* at 441-42. The court distinguished the questions of whether a duty of care exists and what precautions are necessary to satisfy that duty. It explained:

"It is inadvisable for courts to conflate the concepts of duty and breach in this manner. Courts could, after all, 'state an infinite number of duties if they spoke in highly particular terms,' and while particularized statements of duty may be comprehensible, 'they use the term duty to state conclusions about the facts of particular cases, not as a general standard.' 1 D. Dobbs, Torts § 226, at 577 (2001); see also [J. Goldberg, *Introduction to the Restatement (Third) of Torts: General Principles and the John W. Wade Conference,* 54 Vand. L. Rev. 639, 712-17 (2001)] (discussing problems associated with using the duty element of negligence to render decisions that no breach occurred as a matter of law). Thus, the issue in this case is not whether defendants had a duty to install protective poles, or a duty to prevent a car from entering the restaurant, or some such other fact-specific formulation. Because of the special relationship between defendants and the decedent, they owed the decedent a duty of reasonable care. The issue is whether, in light of the particular circumstances of this case, defendants breached that duty." *Id.* at 443-44.

See also *Stearns v. Ridge Ambulance Services, Inc.*, 2015 IL App (2d) 140908, ¶ 13 ("[I]n *Marshall*, our supreme court recognized that purely *ad hoc* determinations that a defendant has a duty to perform or refrain from performing particular acts improperly conflate the concepts of duty and breach."). Based on *Marshall*, Smolucha argues that, once we determine PSN had any duty of

- 28 -

care, the proper standard to satisfy that duty is a disputed question of fact and summary judgment is not proper.

¶ 76    Smolucha overlooks that neither *Marshall* nor *Stearns* concerned duties based on a contract or voluntary undertaking. Instead, both cases depended on common law duties of reasonable care. In such cases, the court first considers, as a question of law, whether the defendant owed the plaintiff a duty of care. See *Marshall*, 222 Ill. 2d at 430 ("Whether a duty exists in a particular case is a question of law for the court to decide."). If so, what specifically constitutes a breach of that duty is a question of fact. See *Stearns*, 2015 IL App (2d) 140908, ¶ 19 (Because the defendant owed the deceased a duty of care, "[w]hat [the defendant] should or could have done to protect [the deceased] bears on the question of whether [the defendant] *breached* its duty. And on the record here, that is a question of fact." (Emphasis in original)).

¶ 77    But when the defendant's duty is based on a contract or voluntary undertaking, the duty is limited to the extent of the agreement or undertaking. See *Eichengreen*, 325 Ill. App. 3d at 525 ("A defendant's duties will not be expanded beyond the scope of duties required by the contract."); see also *Elam*, 2019 IL App (1st) 181123, ¶ 41. Evidence of industry standards is also relevant. See *Murphy*, 41 Ill. App. 3d at 661. Of course, the terms of the contract, extent of the undertaking, and professional standards are also questions of fact. See *Mulliken*, 245 Ill. App. 3d at 516; see also *Elam*, 2019 IL App (1st) 181123, ¶¶ 48-52 (surveying the record for evidence that the defendant voluntarily undertook the specific duties alleged and finding no such evidence); *Bell v. Hutsell*, 2011 IL 110724, ¶ 25 ("[W]e first look to the factual allegations of plaintiff's complaint to ascertain the scope of the duty plaintiff may reasonably claim defendants intended to undertake, and to determine whether performance was commenced."); *Advincula*, 176 Ill. 2d at 24 ("[W]e note that in professional negligence cases, unlike negligence actions in general, the plaintiff bears

a burden to establish the standard of care through expert witness testimony."). These specific factual inquiries determine the scope of the contractual or undertaken duty.

¶ 78        Here, Smolucha has provided enough evidence, when it is construed in his favor, to show that PSN agreed and contracted only to provide combustion tuning services, to provide expedited services as of January 24, 2018, perhaps to inspect the furnace on January 26, 2018, and to act in a professional manner in so doing. We see no evidence in the record that PSN agreed to accept duties beyond these or to refute Wyant and Stallard's account of the applicable standards for such services.

¶ 79                                    2. *Causation*

¶ 80        Having established PSN's duties, we now consider whether Smolucha can prove PSN's breach of those duties caused or contributed to his injuries. "Generally, proximate cause is a question of fact; however, it becomes a question of law when the facts alleged indicate that a party would never be entitled to recover." *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 81        According to PSN, no evidence shows it caused Smolucha's injuries. It argues the combustion system was never exhausting unsafe levels of CO. Wyant testified that the combustion system emits some amount of CO by design and that the concentration of CO changes over time. But, he explained, tuning addresses this problem, and monitoring the concentration of CO is solely a matter of efficiency, not safety. Wyant testified that inadequate tuning can never result in unsafe levels of CO. PSN claims that this testimony is undisputed and that no evidence indicates the combustion systems ever emitted unsafe levels of CO, so its servicing of the combustion system cannot have resulted in Smolucha's injuries.

¶ 82 Smolucha relies on the abundant evidence that the combustion system was exhausting CO prior to PSN's tuning on January 26, 2018. When PSN's technicians arrived that day and took initial CO readings, they found CO levels of 1500ppm, 2000ppm, 3000ppm, and "MAXppm," indicating CO in excess of 9000ppm. Wyant acknowledged that the industry standard allowed 500ppm and the Subject Furnace was producing "excess" CO. Smolucha further references NFPA's exposure standards, which indicate the increasing dangers of CO exposure as concentrations increase.

¶ 83 We find Smolucha cannot demonstrate PSN caused his injuries. First, he misstates the evidence. Wyant's use of 500ppm and the word "excess" clearly pertained only to efficiency, not safety. Furthermore, PSN's CO readings measured the concentration of CO in the "stacks" of the Subject Furnace, before the gas was diluted with air from the general atmosphere. The CO concentrations in PSN's measurements must be higher than the concentration of CO actually emitted into the atmosphere after dilution. Smolucha's attempt to juxtapose the NFPA standards against PSN's readings is misleading.

¶ 84 More importantly, as discussed above, whatever duty PSN might have had on January 26, PSN had no duties to inspect the Subject Furnace for contributions to CO in the atmosphere or to repair the Subject Furnace before that date. There is no evidence that PSN's combustion tuning services before January 2018 damaged the Subject Furnace or otherwise contributed to unsafe levels of CO in the factory. Instead, all the evidence indicates that PSN appropriately tuned the Subject Furnace to achieve the preferred air-to-fuel ratio necessary for efficient combustion. Therefore, PSN's conduct before January 2018 cannot be a cause of Smolucha's injury.

¶ 85        Of course, Smolucha experienced CO poisoning on January 27, January 29, and February 16, 2018. Nevertheless, he cannot show that PSN's negligence in any inspection on January 26 caused these injuries, either. The only alleged defects in the Subject Furnace—such as inadequate venting or suboptimal tubing—are those PSN's technician identified. There is no evidence of some other defect that PSN should have identified but did not. Smolucha claims PSN's failure to recommend that PTC immediately shut down the Subject Furnace after Stallard identified these defects contributed to his injury, but he did not provide any evidence that PSN accepted such a responsibility, that it was part of the professional standard of care, or that PTC would have followed such a recommendation. Moreover, the only evidence in the record indicates that during its January 26 service call, PSN reduced the CO emissions from the combustion system to 0ppm. Smolucha's only argument that PSN is responsible for CO in the atmosphere is that he suffered injuries after PSN's January 26 visit. But this does not prove the CO in the atmosphere came from the combustion system, or even from the Subject Furnace, when other machinery in the factory also used or produced CO. Nor does it prove that PSN negligently failed to identify some unknown defect in the Subject Furnace. Indeed, Smolucha identifies no such defect.

¶ 86        Smolucha relies on *Ferrell v. Esparza*, 332 Ill App. 3d 518 (2001). There, a warehouse employee suffered CO poisoning while two different companies were using steam-cleaning machines to clean the warehouse. *Id.*at 519-21. He sued one of the companies, alleging that the company's employees negligently operated the steam-cleaning machine inside the warehouse, despite clear instructions that the machine should be operated out of doors. *Id.* at 519-20. The trial court granted summary judgment for the plaintiff, and the appellate court affirmed. *Id.* at 519, 527. The defendant's own expert acknowledged that CO from the steam-cleaning machine spread through the warehouse. *Id.* at 522. The defendant was "liable

because its tortious conduct was an actual and proximate cause of the plaintiff's injury, and the fact that another individual or entity also contributed to the plaintiff's injury does not alter the concurring tortfeasor's responsibility for the entire indivisible injury." *Id.* at 526. Based on *Ferrell*, Smolucha claims that if least some amount of CO in the factory atmosphere can be attributed to PSN, a question of material fact on the extent of PSN's liability remains.

¶ 87    This case is not like *Ferrell*. In *Ferrell*, the undisputed evidence indicated that the defendant's negligence contributed to CO in the warehouse. Here, no evidence indicates that PSN's negligence contributed to CO in the factory. Although there is evidence that the combustion system emitted at least some CO, PSN's negligence did not cause these emissions. Instead, some CO emissions were simply a feature of the combustion system, even when it functioned properly. Nor did PSN cause the combustion system to become untuned. This was inevitable in between tunings. The evidence also does not show that PSN's inspection on January 26 caused CO accumulation. Therefore, *Ferrell* is inapplicable.

¶ 88    Smolucha has failed to raise a genuine issue of material fact showing that PSN's breach of any of its duties caused his injury. Therefore, the trial court properly granted summary judgment for PSN.

¶ 89                        III. CONCLUSION

¶ 90    For the reasons stated, we affirm the trial court's judgment.

¶ 91    Affirmed.